| | | |
|---|---|---|
| RYAN D. BURNETT, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 2:16-cv-00359-JAW |
| | ) | |
| OCEAN PROPERTIES, LTD. | ) | |
| and AMERIPORT, LLC, | ) | |
| | ) | |
| Defendant. | ) | |

## ORDER ON MOTION FOR SUMMARY JUDGMENT

A disabled employee brings suit against his employer alleging violations of the Americans with Disabilities Act (ADA), 42 U.S.C. §§ 12101 *et seq.*, the Maine Whistleblower Protection Act, 26 M.R.S. §§ 831 *et seq.*, and the Maine Human Rights Act, 5 M.R.S. §§ 4571 *et seq.* The Defendants move for summary judgment on all claims. The employee has not established a prima facie case of retaliation or discrimination by disparate treatment because he did not suffer an adverse employment action as a result of his disability. The employer is entitled to summary judgment on those claims. The employer, however, is not entitled to summary judgment on one subset of the employee's claim that it failed to reasonably accommodate his disability.

## I. PROCEDURAL HISTORY

On July 1, 2016, Ryan D. Burnett filed a complaint against Ocean Properties Ltd. (Ocean Properties) and AmeriPort LLC (AmeriPort) (collectively Defendants,

AmeriPort),[1] and he filed an amended complaint on September 26, 2016. *Compl.* (ECF No. 1); *First. Am. Compl.* (ECF No. 7) (*Am. Compl.*). On November 25, 2016, the Defendants filed a partial motion to dismiss and a motion to strike certain allegations in the Amended Complaint. *Defs.' Partial Mot. to Dismiss Pl.'s Am. Compl. and Mot. to Strike Impertinent Allegations* (ECF No. 19). On April 11, 2017, the Court denied the motion to dismiss and the motion to strike. *Order on Mot. to Dismiss* (ECF No. 37).

On November 13, 2017, AmeriPort filed a motion for summary judgment and a statement of facts. *Defs.' Mem. of Law in Support of Mot. for Summ. J.* (ECF No. 68); *Defs.' Statement of Material Facts* (ECF No. 69) (DSMF). They amended their

---

[1]     Mr. Burnett alleged in the Complaint that his employer was AmeriPort LLC (AmeriPort) but that AmeriPort was "an integrated enterprise with its parent company, Ocean Properties, Ltd." *Compl.* ¶ 5. He then alleged that AmeriPort had been administratively dissolved and was no longer authorized to do business in the state of Maine. *Id.* ¶ 6. He therefore asserted that his employer was Ocean Properties as it owned and operated the hotel where he worked. *Id.* ¶ 7.

On September 6, 2016, Ocean Properties filed a motion to dismiss the complaint under Rule 12(b)(1) and 12(b)(6), asserting, among other things, that it is not a proper party to the lawsuit. *Def.'s Mot. to Dismiss Pl.'s Compl.* (ECF No. 5). On September 26, 2016, Mr. Burnett filed an amended complaint pursuant to Rule 15(a) in which he added AmeriPort as a party defendant. *First Am. Compl.* (ECF No. 7) (*Am. Compl.*). On November 25, 2016, the Defendants filed a partial motion to dismiss Mr. Burnett's Amended Complaint, as well as a motion to strike certain allegations in the Amended Complaint. *Defs.' Partial Mot. to Dismiss Pl.'s Am. Compl. and Mot. to Strike Impertinent Allegations* (ECF No. 19). On April 11, 2017, the Court denied the motion to dismiss and the motion to strike because a more detailed factual record was needed in order to determine if the two entities shared an identity of interest. *Order on Mot. to Dismiss* (ECF No. 37).

The parties do not make additional arguments in their summary judgment memoranda based directly on the identity of interest question, and they have not submitted additional evidence to assist the Court. But the issue pervades their responses to each other's statements of facts. Throughout their statements of facts the parties attribute the same facts to different entities. For example, Mr. Burnett sometimes describes his employer as Ocean Properties and the actions of his supervisors as the employees or agents of that company and of AmeriPort, whereas the Defendants ascribe those actions and individuals to AmeriPort only.

Since the issue now appears to be ancillary, and because the Court is obligated to view contested facts in the light most favorable to Mr. Burnett, *see* footnote 2, throughout this order the Court frequently uses "AmeriPort" to refer to both companies but adopts Mr. Burnett's perspective of an identity of interest such that the actions of AmeriPort may be attributed to Ocean Properties. At other times, the Court resolves ancillary factual disputes by replacing certain references to one company with the other company or both companies.

motion on November 21, 2017. *Defs.' Am. Mem. of Law in Support of Mot. for Summ. J.* (ECF No. 71) (*Defs.' Mot.*).

On December 29, 2017, Mr. Burnett filed responses to AmeriPort's motion and the Defendants' statement of facts. *Pl.'s Opp'n to Summ. J.* (ECF No. 75) (*Pl.'s Opp'n*); *Pl.'s Opposing and Additional Statement of Material Facts* at 1-22 (ECF No. 76) (PRDSMF). Mr. Burnett also filed additional statements of fact. *Pl.'s Additional Statement of Material Facts* at 22-33 (ECF No. 76) (PSAMF).

On January 23, 2018, AmeriPort replied to Mr. Burnett's response and Mr. Burnett's additional statements of fact. *Defs.' Reply in Support of Mot. for Summ. J.* (ECF No. 79) (*Defs.' Reply*); *Defs.' Reply to Pl.'s Additional Statement of Facts in Opp'n to Defs.' Mot. for Summ. J.* (ECF No. 80) (DRPSAMF).

## II.   STATEMENT OF FACTS[2]

### A.   The Parties

Ocean Properties is a duly authorized Maine business corporation that operates numerous hotels nationwide, including the Sable Oaks Marriott[3] in South Portland. *Am. Compl.* ¶ 4.[4] Ocean Properties has employed more than 500 employees

---

[2]     In accordance with "conventional summary judgment praxis," the Court recounts the facts in the light most favorable to Mr. Burnett's theory of the case consistent with record support. *Gillen v. Fallon Ambulance Serv., Inc.*, 283 F.3d 11, 17 (1st Cir. 2002). In compliance with this obligation, the Court recites certain events as facts even though Ameriport and Ocean Properties dispute them.

[3]     The parties are not entirely clear about the precise location and facilities at issue in this case. *See* Am. Compl. ¶ 4; DSMF ¶ 1; PRDSMF ¶ 1 (disputing the numeric address on Sable Oaks drive and hotel name of the call center). This dispute is not material, but the Court takes judicial notice of the addresses and locations of the Marriott and the adjacent golf club at Sable Oaks Drive and Country Club Drive in South Portland and the Holiday Inn Express & Suites that is nearby. Throughout this order, the Court addresses the slight differences between the parties' statements by adopting Mr. Burnett's version, by reconciling minor differences, or by referring to the properties as a group.

[4]     The parties did not include statements describing the parties in their statements of material facts. Since the parties do not dispute (at this stage of the litigation) the locations and identity of

3

nationwide in each of twenty or more calendar weeks in the current and preceding calendar years. *Am. Compl.* ¶ 16. Ocean Properties is one of the largest and most dynamic privately held hotel management and development companies in North America, with an award-winning portfolio of over 100 hotels and 17,000 guestrooms. PSAMF ¶ 47; DRPSAMF ¶ 47.

Ocean Properties calls the Sable Oaks Marriott "AmeriPort". *Am. Compl.* ¶ 5. AmeriPort is a former New Hampshire Limited Liability Company no longer authorized to do business in either Maine or New Hampshire. *Am. Compl.* ¶ 11. AmeriPort, LLC has been administratively dissolved and has not filed an annual report since 2011. *Am. Compl.* ¶ 12.

Ryan D. Burnett resides in the town of Eliot, Maine. *Am. Compl.* ¶ 3. Mr. Burnett worked in Ocean Properties' Portland reservation center, located at various times in several locations in the Sable Oaks properties in South Portland.[5] *Am. Compl.* ¶¶ 6-7. Mr. Burnett is paralyzed from the T-9 level of his spine and below. DSMF ¶ 5; PRDSMF ¶ 5. Mr. Burnett has used a wheelchair for his entire adult life and uses a truck with a specially designed chair lift for transportation. DSMF ¶ 5; PRDSMF ¶ 5. Mr. Burnett cannot park in a regular spot because his truck has a wheelchair lift on the driver's side that assists him with loading and unloading his chair. PSAMF ¶ 6; DRPSAMF ¶ 6. This takes up nearly another whole parking spot on his driver's side, and if a car parked beside him unaware of this issue, Mr. Burnett

---

interest of the parties, *see* footnote one, the Court includes Mr. Burnett's version as stated in the Amended Complaint, which is generally supported by statements in the various affidavits and depositions in the record.

[5]     *See* footnote three.

would not be able to get back into his vehicle. PSAMF ¶ 6; DRPSAMF ¶ 6. Due to his paralysis, Mr. Burnett has no control over his bowel movements. DSMF ¶ 6; PRDSMF ¶ 6.

On May 16, 2009, Ocean Properties hired Mr. Burnett to work as a Reservations Agent at a call center. DSMF ¶ 1; PRDSMF ¶ 1. The call center was initially located in the basement of the Holiday Inn & Suites near the Sable Oaks Marriot.[6] DSMF ¶ 1; PRDSMF ¶ 1; PSAMF ¶ 1; DRPSAMF ¶ 1. As a Reservations Agent, Mr. Burnett was responsible for taking calls for reservations at various hotels across the country. DSMF ¶ 3; PRDSMF ¶ 3. Mr. Burnett's disability was apparent at the time AmeriPort hired him. DSMF ¶ 6; PRDSMF ¶ 6.

Mr. Burnett reported directly to several supervisors during his time as a Reservations Agent. DSMF ¶ 3; PRDSMF ¶ 3. Until the last eight months of his employment, Mr. Burnett's supervisor was Lori Darsaoui.[7] DSMF ¶ 3; PRDSMF ¶ 3. Ms. Darsaoui is the payroll administrator for AmeriPort, Sable Golf, LLC, and GHM Portland Holiday Inn, LLC. PSAMF ¶ 8; DRPSAMF ¶ 8.

Ms. Darsaoui's supervisor was Vice President of Revenue Management, Joyce Dawson.[8] DSMF ¶ 4; PRDSMF ¶ 4. Ms. Dawson is the person at the top of the

---

[6]     Mr. Burnett denied AmeriPort's paragraph one, which referred to a "Sable Oaks Business Park Location," because of a disagreement about the location of the call center. PRDSMF ¶ 1. The Court resolves the denial by modifying the statement. See footnote three.

[7]     Mr. Burnett offered a qualified admission to AmeriPort's paragraph three, which indicated that Ms. Darsaoui was a human resources representative; he admitted portions of the paragraph but denied that Ms. Darsaoui was a human resources representative. PRDSMF ¶ 3. The Court excises the contested portion of AmeriPort's paragraph to resolve the qualification.

[8]     Mr. Burnett offered a qualified admission, contending that Ms. Dawson was employed by another subsidiary of Ocean Properties, Portsmouth Corporate Financial Services (PCFS). PRDSMF

organizational chart for the entity referred to as AmeriPort. PSAMF ¶ 7; DRPSAMF ¶ 7. Ms. Dawson also works for another entity called "PCFSI" with the title Vice President of Revenue Management. PSAMF ¶ 7; DRPSAMF ¶ 7. Ms. Dawson's supervisor is Tom Varley, who works for one of Defendants' affiliates. PSAMF ¶ 9; DRPSAMF ¶ 9.[9]

## B. The Locked Rear Entrance at the Holiday Inn

Since Mr. Burnett's place of employment in 2009 was inside a hotel, he expected that it would be wheelchair accessible at all times, without the need for him to request an accommodation.[10] PSAMF ¶ 2; DRPSAMF ¶ 2. The first day Mr. Burnett went to work in the reservation call center, the door near the handicapped accessible ramp in the back of the building was locked.[11] PSAMF ¶ 3; DRPSAMF ¶

---

¶ 4. Since Mr. Burnett's additional information is not inconsistent with AmeriPort's statement, the Court includes the unmodified statement.

[9] Mr. Burnett sought to include a number of statements about what employers' responsibilities are toward employees, or what "should" or "should not" happen. PSAMF ¶¶ 10-14, 20, 22, 61. For example, Mr. Burnett said, "As an employer, AmeriPort needs to make the entrance to the workplace accessible," PSAMF ¶ 12, and "Mr. Burnett should not have to wheel himself across the lawn in order to access the building where he works." PSAMF ¶ 14. AmeriPort offered a mix of admissions, qualifications, and denials. DRPSAMF ¶¶ 10-14, 20, 22, 61.

The local rules require a short, plain statement of *fact*. D. ME. LOC. R. 56(b) (emphasis supplied). Without taking a position on any of the issues discussed in those paragraphs, and without delving into philosophical questions about the validity of fact-value distinctions, the Court does not include those statements because they represent legal arguments and conclusions or moral claims, not statements of facts for a Court to consider at summary judgment. *See e.g. Bourgoin v. Sebelius*, 296 F.R.D. 15, 22 (D. Me. 2013) ("Statements of law are not statements of fact. Legal argument is more properly included in a memorandum of law than in a statement of material facts . . . ."); David Hume, *A Treatise of Human Nature* at 469-70 (1739) ("I have always remark'd, that the author proceeds for some time in the ordinary way of reasoning . . . when of a sudden I am surpriz'd to find, that instead of the usual copulations of propositions, *is*, and *is not*, I meet with no proposition that is not connected with an *ought*, or an *ought not*.").

[10] AmeriPort denied Mr. Burnett's original statement because Mr. Burnett knew that some doors required keycard access for safety reasons. DRPSAMF ¶ 2. The denial is not pertinent because Mr. Burnett's paragraph does not say anything about keycard access or particular entrances.

[11] Mr. Burnett's original paragraph was followed by the additional words, "and he could not access the building." PSAMF ¶ 3. The Defendants disputed this additional phrase because Mr. Burnett elsewhere stated that he was able to "pop" that door and gain access at other times.

3. Mr. Burnett had to wheel his chair across the lawn, approximately fifty feet, over uneven ground, not an easy task for someone in a wheelchair.[12] PSAMF ¶ 4; DRPSAMF ¶ 4. Mr. Burnett would have accessed the employee entrance for the reservation agents working in the basement of the Holiday Inn via the sidewalk instead of wheeling across the lawn, but he could not because there was a six-inch curb to get up over.[13] PSAMF ¶ 5; DRPSAMF ¶ 5.

Ms. Darsaoui informed Mr. Burnett that he could use the handicapped accessible ramp at the rear entrance of the hotel if he chose to do so.[14] DSMF ¶ 53; PRDSMF ¶ 53. AmeriPort provided Mr. Burnett a keycard to access the rear door, though he alleges that sometimes the keycard did not function properly.[15] DSMF ¶ 53; PRDSMF ¶ 53. When his keycard did not work properly, Mr. Burnett would resolve the situation by tugging at the door until "it would pop." DSMF ¶ 54; PRDSMF ¶ 54. Mr. Burnett stated that he could have used the front entrance to enter the building rather than "pop" the door, but only if the single handicapped

---

DRPSAMF ¶ 3. The Court omits the additional words because, as described in his next paragraph, Mr. Burnett was able to access the building via another entrance.

[12] AmeriPort denied this statement, citing Mr. Burnett's deposition testimony that he was able to "pop" that door open "each time" he had trouble accessing that door because his keycard did not work. DRPSAMF ¶ 4. The Court resolves any tension between Mr. Burnett's deposition and affidavit in Mr. Burnett's favor and includes the statement.

[13] AmeriPort offered a qualified admission because there was a curb, but they accommodated Mr. Burnett by providing a keycard to use the rear guest entrance. DRPSAMF ¶ 5. Since this qualification is not inconsistent with Mr. Burnett's statement, the Court includes the original statement.

[14] Mr. Burnett denied this statement and offered additional details about the availability of parking spots near the rear door, one of the incidents discussed later. PRDSMF ¶ 53. Because the Court includes this statement in a different location in the summary of facts, and because the statement is supported by the record evidence, including Mr. Burnett's own deposition testimony, the Court rejects the denial.

[15] See previous footnote.

parking spot near the front of the building was available.[16]  DSMF ¶ 55; PRDSMF ¶ 55.

When the head of maintenance, Walter Reiter III, discovered the door needed to be replaced due to Mr. Burnett's tugging, he told Mr. Burnett "the next time we have to replace the door, it is coming out of your salary."  DSMF ¶ 54; PRDSMF ¶ 54. Mr. Burnett had not yet made any complaints of discrimination, he had never talked with Mr. Reiter before the incident, and he had never requested anything of Mr. Reiter previously, and he only knew Mr. Reiter in passing.[17]  DSMF ¶ 56; PRDSMF ¶ 56.[18]

After Mr. Burnett informed Ms. Dawson of the incident, an accommodation was made to forego the keycard access and leave the door unlocked after 6 a.m. for Mr. Burnett's access.  DSMF ¶ 58; PRDSMF ¶ 58.  According to Mr. Burnett, this was

---

[16]     Mr. Burnett denied AmeriPort's original statement, which did not specify that the front door entrance was only feasible if the parking spot was available.  PRDSMF ¶ 55.  The Court modifies the statement to resolve the denial.

[17]     Mr. Burnett objects to AmeriPort's paragraph fifty-six, a portion of which comprises this statement.  PRDSMF ¶ 58.  Mr. Burnett claims the statement "is offered to show that Mr. Burnett was not 'retaliated' against" by Mr. Reiter, because he had not yet filed his charge or made any complaints of discrimination.  PRDSMF ¶ 58.  Mr. Burnett explains that "he did not claim 'retaliation' initially because he did not have a lawyer at the time, and did not 'fully understand' the distinction between retaliation and discrimination" on the Maine Human Rights Commission's charging form.  PRDSMF ¶ 58.  Mr. Burnett objects because "[t]hese are legal definitions, not statements of material fact."  PRDSMF ¶ 58.  The Court overrules the objection because the statement accurately reflects Mr. Burnett's own view of the timing of events and his testimony about his relationship, or lack thereof, with Mr. Reiter.  Mr. Burnett's arguments about the legal significance, or lack thereof, of that timing, are best left for legal memoranda.

[18]     AmeriPort also sought to include: "Burnett did not immediately inform human resources of the incident with the rear door.  Instead, Burnett waited until Dawson was in the office overseeing the installation of a new piston or door hinge to tell her what had occurred between him and the head of maintenance."  DSMF ¶ 57.  Mr. Burnett admitted that he informed Ms. Dawson but offered a qualification because he denied that he "waited" to tell her.  PRDSMF ¶ 57.  Since the timing is not clear from the record, the Court adopts Mr. Burnett's version that he did not delay and omits AmeriPort's paragraph fifty-seven.

the accommodation that he wanted from AmeriPort, as he had asked for the door to be unlocked before that point.[19]  DSMF ¶ 58; PRDSMF ¶ 58.

Ms. Darsaoui described Mr. Reiter's behavior toward Mr. Burnett as "inappropriate and unprofessional."  PSAMF ¶ 29; DRPSAMF ¶ 29.  Ms. Darsaoui does not recall whether Mr. Reiter received corrective action but said that if he had, it would be in his personnel file.[20]  PSAMF ¶ 29; DRPSAMF ¶ 29.  Although Mr. Burnett was not sure who spoke to the head of maintenance about the incident, Mr. Reiter later came and apologized to Mr. Burnett for the manner in which he handled having to replace the door.  DSMF ¶ 59; PRDSMF ¶ 59.

### C.    The Blocked Ramp at the Holiday Inn

On one occasion in 2012, a handicapped guest had parked in the handicap loading/unloading zone while Mr. Burnett was trying to leave work, which blocked Mr. Burnett from using the access ramp and forced him to use another exit point to get to his vehicle.[21]  DSMF ¶ 40; PRDSMF ¶ 40.  After he reported the issue to Ms.

---

[19]    Mr. Burnett offers a qualified admission but takes issue with the phrase "that he wanted," because Mr. Burnett had asked for that accommodation before the incident with Mr. Reiter.  The Court modifies AmeriPort's original statement to clarify that the accommodation Mr. Burnett eventually received was originally sought before that incident.

[20]    AmeriPort offered a qualification because while it admits that Ms. Darsaoui could not recall whether Mr. Reiter received a corrective action, she did recall sitting down with him and the General Manager to discuss Mr. Reiter's behavior.  DRPSAMF ¶ 29.  Since the statement accurately reflects Ms. Darsaoui's deposition testimony and the Court must view the evidence in the light most favorable to Mr. Burnett, the Court rejects the qualification.

[21]    Mr. Burnett denied this statement because the ramp was blocked on other occasions, but he only reported it one time.  DRPSAMF ¶ 40.  To present the facts in the light most favorable to Mr. Burnett and resolve the denial, the Court includes a portion of Mr. Burnett's response to AmeriPort's paragraph forty-one at the end of this subsection.  Mr. Burnett's response is supported by the portion of deposition testimony AmeriPort cites in their paragraphs forty and forty-one.

Darsaoui, Mr. Burnett was dissatisfied that Ms. Darsaoui did not have the guest's car towed or ticketed. DSMF ¶ 41; PRDSMF ¶ 41.

On that occasion, Ms. Darsaoui believed a guest with a handicapped sticker was parked in a handicapped spot in the back of the building, and she told Mr. Burnett, "I couldn't prevent someone who was a guest at the hotel and had a handicapped accessible designation on their vehicle from parking there. I can't control that."[22] PSAMF ¶ 30; DRPSAMF ¶ 30. Ms. Darsaoui did not see the guest's vehicle that was blocking the ramp; she instead relied on the general manager who told her that "the guest was legitimately in the parking spot." PSAMF ¶ 31; DRPSAMF ¶ 31. However, the issue was not that a guest was parked in a handicapped parking space, it was that the guest had parked in a loading/unloading zone and completely blocked the handicapped ramp to the back-door entrance, so that Mr. Burnett could not access the ramp.[23] PSAMF ¶ 32; DRPSAMF ¶ 32.

This was the only occasion during Mr. Burnett's seven years with AmeriPort where he reported that the loading/unloading zone was blocked and the only occasion where a guest completely blocked the access ramp.[24] DSMF ¶ 41; PRDSMF ¶ 41. Mr. Burnett testified that access to the ramp was partially obstructed on other occasions,

---

[22]    AmeriPort denied this statement, but the extra details AmeriPort provides are consistent with Mr. Burnett's paragraph thirty. DRPSAMF ¶ 30. The Court includes the statement.

[23]    AmeriPort offered a qualified admission. DRPSAMF ¶ 32. Because the extra detail AmeriPort provides is consistent with the original statement, the Court overrules the qualification.

[24]    AmeriPort's paragraph forty also included: "Burnett admitted he incurred no damages as a result of this incident," to which Mr. Burnett objected that the Defendant's statement is a legal issue, not a statement of fact. PRDSMF ¶ 41. The Court agrees with Mr. Burnett and, therefore, omits that portion of paragraph forty-one.

but he was able to get around the obstruction and did not report those incidents.[25]
PRDSMF ¶ 41. Prior to the time that the guest blocked the handicapped ramp, it
was up to Mr. Burnett to come to his supervisor to report accessibility issues.[26]
PSAMF ¶ 34; DRPSAMF ¶ 34.

### D.    The Snowstorm Incident

On December 30, 2012, there was a snowstorm, and by the time Mr. Burnett
reported to work at the Holiday Inn location the following morning, on December 31,
2012, the rear access ramp had not been completely shoveled. DSMF ¶ 43; PRDSMF
¶ 43. The front entrance to the hotel was shoveled, but the handicap parking spots
at the front of the building were full.[27] DSMF ¶¶ 43, 45; PRDSMF ¶¶ 43, 45. Mr.
Burnett did not attempt to park and enter through the front entrance of the building
and instead went home.[28] DSMF ¶ 44; PRDSMF ¶ 44.

The same day, on December 31, 2012, Mr. Burnett reported to Ms. Darsaoui
that he had an issue accessing the building to get to work following the snowstorm in
which the walkways and ramps were not cleared. PSAMF ¶ 36; DRPSAMF ¶ 36. Mr.
Burnett told Ms. Darsaoui that "honestly this is not the first time" he had

---

[25]    *See* footnote twenty-one.

[26]    AmeriPort offered a qualification, suggesting that Mr. Burnett had already been granted a different accommodation, the ability to park under the front canopy of the hotel, but Mr. Burnett says that did not happen until later. DRPSAMF ¶ 34. The Court adopts Mr. Burnett's view of the disputed fact at summary judgment and includes the statement.

[27]    AmeriPort's original statement characterized the front entrance as "accessible", which Mr. Burnett denied because there were no handicapped parking spots available there. PRDSMF ¶ 45. The Court removed the offending words in order to present Mr. Burnett's version of potentially contested facts.

[28]    Mr. Burnett denied this statement, offering extra detail regarding his decision to go home, rather than attempt to park and enter through the front entrance. PRDSMF ¶ 44. The record evidence supports the statement and Mr. Burnett's extra detail is not inconsistent with the original description of the events, so the Court includes the statement.

encountered issues with "access to the building."[29] PSAMF ¶ 37; DRPSAMF ¶ 37. Mr. Burnett offered that Ms. Darsaoui could contact his vocational rehab counselor at the Department of Labor for more information. PSAMF ¶ 38; DRPSAMF ¶ 38.

On January 2, 2013, Mr. Burnett submitted a "missed punch" form to Ms. Darsaoui requesting that he be compensated for the December 31, 2012 shift he did not work. DSMF ¶ 46; PRDSMF ¶ 46. Ms. Darsaoui responded to Mr. Burnett by telling him that he is permitted to park under the canopy at the main entrance of the hotel and enter through the main lobby. DSMF ¶ 47; PRDSMF ¶ 47. This was the first time anyone mentioned to Mr. Burnett that he was permitted to park underneath the canopy.[30] PSAMF ¶ 33; DRPSAMF ¶ 33. Ms. Darsaoui also reminded Mr. Burnett that he was free to park in any of the hotel's handicapped parking spots in the front or rear of the hotel if needed.[31] DSMF ¶ 47; PRDSMF ¶ 47.

When Mr. Burnett complained that he could not access the building on or about December 31, 2012, Ms. Darsaoui believed that he had arrived to work, saw that the back of the building was not cleared of snow, left work without trying to access the building in the front, and then asked to be paid for the day. PSAMF ¶ 39; DRPSAMF

---

[29] AmeriPort offered a qualification because Mr. Burnett later testified that this was the only time he could not access the building due to snow. DRPSAMF ¶ 37. The Court rejects the qualification because there is no dispute that the statement accurately reflects what Mr. Burnett told Ms. Darsaoui.
[30] AmeriPort denied this statement, arguing that Mr. Burnett was granted this accommodation before that point. DRPSAMF ¶ 33. There is a genuine dispute about when Ameriport granted this accommodation. The Court adopts Mr. Burnett's version at summary judgment. *See infra* footnote seventy-three.
[31] Mr. Burnett admitted the nature of Ms. Darsaoui's response but denied that it was feasible for him to park in the back and wheel himself to the front entrance and denied that he received permission to park under the front canopy until after the snowstorm incident. PRDSMF ¶ 47. The Court omits the portion about the canopy but otherwise includes the statements because Mr. Burnett admits that this is what Ms. Darsaoui said, but the Court does not draw the further inferences that underlie Mr. Burnett's qualification.

¶ 39.  Ms. Darsaoui does not know whether Mr. Burnett tried to access the front of the building after the snowstorm on December 31, 2012, and she did not find out before concluding that "he didn't work, which is why he was not paid for the day."[32] PSAMF ¶ 40; DRPSAMF ¶ 40.  Ms. Darsaoui believes that if a snowstorm makes it difficult for an employee like Mr. Burnett to travel and access the workplace, "it would be the employee's responsibility" to call and "discuss with us if there were individual situations that needed an accommodation."[33]  PSAMF ¶ 41; DRPSAMF ¶ 41.

Even though Ms. Darsaoui knows that Mr. Burnett cannot physically walk and, therefore, must wheel his chair through snow when there is a significant storm in order to get to and from work, Ms. Darsaoui would need more information to know whether this would be a reason to excuse him from being absent from work due to snow.  PSAMF ¶ 42; DRPSAMF ¶ 42.  Some of the questions Ms. Darsaoui would want answered about whether absence due to a snowstorm is disability-related include: "where the issue was, if it was at the home, if it was at the workplace, what the issue was."  PSAMF ¶ 43; DRPSAMF ¶ 43.  However, although Ms. Darsaoui called Mr. Burnett and left voicemails after he did not arrive for his shift, she never

---

[32]     AmeriPort denied this statement, maintaining that all of the ramps and entry points were cleared at the front and that Mr. Burnett was aware that he was permitted to park under the front canopy if there were access issues at the rear of the building.  DRPSAMF ¶ 40.  The Court includes the statement because it accepts Mr. Burnett's version of contested facts for purposes of AmeriPort's summary judgment motion.
[33]     AmeriPort denied Mr. Burnett's original statement for inaccurately characterizing Ms. Darsaoui's deposition testimony.  DRPSAMF ¶ 41.  The Court modified the statement to hew more closely to the deposition testimony.

had a conversation about the reason Mr. Burnett needed to miss work due to a snowstorm.[34]  PSAMF ¶ 44; DRPSAMF ¶ 45.

Ms. Dawson said that in the event of snowstorms presenting access challenges, she would work hard to make sure that snow would be removed so that an employee like Mr. Burnett would be able to access the building and be able to work, and that she "can't understand a situation where we wouldn't be able to get the snow removed so someone could enter a building."[35]  PSAMF ¶ 35; DRPSAMF ¶ 35.  This was the only incident in Mr. Burnett's nearly seven years with AmeriPort that he could not access the building due to snow.[36]  DSMF ¶ 48; PRDSMF ¶ 48.

### E.    Moving Mr. Burnett's Truck for a Kitchen Delivery

Several months later, in the spring of 2013, a maintenance employee and a morning cook told Mr. Burnett that there was a scheduled kitchen delivery and he needed to move his truck from under the hotel's front entrance canopy or it would be towed.[37]  DSMF ¶ 50; PRDSMF ¶ 50.  The employees indicated that the directive

---

[34]    AmeriPort offered a qualification to the original statement, which did not mention Ms. Darsaoui's efforts to contact Mr. Burnett.  DRPSAMF ¶ 44.  The Court includes the information about the phone calls to hew more closely to Ms. Darsaoui's deposition testimony.

[35]    AmeriPort denied Mr. Burnett's original statement, which read, "Ms. Dawson cannot understand a situation where the building would not be accessible to Mr. Burnett just because it snowed."  DRPSAMF ¶ 35.  The Court modified Mr. Burnett's paragraph 35 to hew more closely to the actual deposition testimony.

[36]    Mr. Burnett denied this statement because on another occasion he was asked to move his truck or it would be towed, *see* infra, and there was snow on the ground and it was "nasty weather."  PRDSMF ¶ 48.  According to Mr. Burnett's testimony he was inside the building, meaning the snow and "nasty weather" did not prohibit him from accessing the building on the occasion in question, so the Court includes the statement for that limited claim only.  Consistent with its duty to draw all reasonable inferences in Mr. Burnett's favor, however, the Court does not view this statement as indicating that Mr. Burnett never faced any other obstacles during his employment as result of snow coupled with his disability.

[37]    Mr. Burnett denied the original statement because it said that the other employees "told" him to move his truck, but really he was told to move it or it would be towed.  PRDSMF ¶ 50.  The Court adjusts the statement to resolve the denial.

came from General Manager Jason Bartlett, although Mr. Bartlett was not with the employees when they told Mr. Burnett to move his truck, nor did Mr. Burnett speak with Mr. Bartlett about it afterward.[38]  DSMF ¶ 50; PRDSMF ¶ 50.

No AmeriPort management personnel witnessed this incident, but Mr. Burnett did tell a shift supervisor about it before leaving work that day.[39]  DSMF ¶ 51; PRDSMF ¶ 51.

### F.    The Bathroom at the Golf Club Location

In December 2013, AmeriPort moved from the Holiday Inn at 303 Sable Oaks Drive to 505 Country Club Drive in South Portland, Maine.  DSMF ¶ 61; PRDSMF ¶ 61.  In November 2013, before the move, some AmeriPort employees went to the new location for a training session, and Mr. Burnett notified another employee, who in turn notified Ms. Darsaoui, that the restroom was not wheelchair accessible.[40] PRDSMF ¶ 62.  After the move, Mr. Burnett emailed Ms. Darsaoui on Christmas Eve, December 24, 2013, indicating that the new building's bathrooms were not wheelchair accessible.[41]  DSMF ¶ 62; PRDSMF ¶ 62.  The same day, Ms. Darsaoui forwarded his email to Ms. Dawson, and by December 26, 2013, AmeriPort

---

[38]      Mr. Burnett denied AmeriPort's paragraph fifty and the first sentence in particular, but did not address the second sentence specifically.  PRDSMF ¶ 50.  Because it does not appear to be contested, the Court includes AmeriPort's second sentence of paragraph fifty but modifies it to more accurately reflect Mr. Burnett's actual deposition testimony.

[39]      Mr. Burnett offered a qualified admission because AmeriPort's statement did not include the fact that Mr. Burnett informed a shift supervisor later that day.  PRDSMF ¶ 51.  Since the record supports Mr. Burnett's claim, the Court includes the statement to resolve the qualification.

[40]      See the next footnote.

[41]      Mr. Burnett denied this statement because he claimed that he notified his supervisors back in November.  PRDSMF ¶ 62.  Both statements are supported by Mr. Burnett's deposition testimony and email records between the parties, so the Court resolves the denial by including Mr. Burnett's statement about his initial notification in November.

representatives were working to address the issues, including the ordering of additional handicap parking signs.[42]  DSMF ¶ 62; PRDSMF ¶ 62.

AmeriPort placed Mr. Burnett on leave until it was able to make the changes to the restroom that Mr. Burnett needed.[43]  DSMF ¶ 63; PRDSMF ¶ 63.  Ms. Darsaoui called him and left a voicemail saying that she wanted to discuss the accessibility issues to "make sure [AmeriPort] got it done right."  DSMF ¶ 63; PRDSMF ¶ 63.  Prior to his return to work, Mr. Burnett was contacted and asked to inspect the bathroom with contractor Mark Mooney.  DSMF ¶ 63; PRDSMF ¶ 63.  Mr. Burnett told Mooney that "this will be fine for what I need it for."[44]  DSMF ¶ 63; PRDSMF ¶ 64.  AmeriPort also installed several new handicapped parking spaces.  DSMF ¶ 63; PRDSMF ¶ 63.

### G.    The Wooden Doors and Handicapped Parking Spaces at the Golf Club Location

In the December 24, 2013 email, Mr. Burnett also indicated that there was an insufficient number of handicapped parking at the new location.  DSMF ¶ 62; PRDSMF ¶ 62.  Mr. Burnett said that there were at least three employees who needed

---

[42]     Mr. Burnett also objects that the modifications that AmeriPort made to the bathroom did not fully "address" the issues because they did not bring the bathroom into full compliance with ADA standards.  PRDSMF ¶ 62.  AmeriPort's statement does not claim full compliance with public accessibility standard, only that they worked to meet his needs, so the Court includes the statement.

[43]     Mr. Burnett offered a qualified admission because he took issue with the phrase in the original statement, "make the necessary modifications," because the modifications still did not comply with all ADA accessibility requirements.  PRDSMF ¶ 63.  The Court resolves the qualification by omitting the disputed words in order to hew more closely to Mr. Burnett's quote that the modifications would "be fine for what I need it for."

[44]     Mr. Burnett responded to the quote that the changes would be "fine for what I need" in his paragraph sixty-four, rather than sixty-three.  PRDSMF ¶ 64.  The Court resolved Mr. Burnett's qualification, as discussed in the previous footnote.  The remainder of the numeric citations after paragraph sixty-four are mismatched by one digit.

to use handicapped spaces and only one handicapped parking space available.[45] PSAMF ¶ 48; DRPSAMF ¶ 48. Ms. Dawson does not know how many handicapped spots were available in the old building. PSAMF ¶ 48; DRPSAMF ¶ 48.

In the December 24, 2013 email, Mr. Burnett also noted that the wooden doors at the front lobby of AmeriPort's new location were not automatic. DSMF ¶ 64; PRDSMF ¶ 65. Mr. Burnett sometimes had difficulty opening these doors if he had his "lunch pail, morning coffee, smoothie or whatever" in one hand.[46] DSMF ¶ 64; PRDSMF ¶ 65. Even without an object in hand, it was sometimes still a struggle for Mr. Burnett to use the doors. PRDSMF ¶ 65. Mr. Burnett was unaware of whether these doors met the push/pull requirements of the ADA.[47] DSMF ¶ 65; PRDSMF ¶ 66.

---

[45] AmeriPort denied the original statement, which indicated that there actually were three employees using handicapped parking spaces, because the record support—Ms. Dawson's deposition testimony—only indicated that Mr. Burnett's email asserted there were three employees; Ms. Dawson never testified that there were in fact three employees. DRPSAMF ¶ 48. The Court modifies the statement to resolve the denial and hew more closely to the underlying evidence of Mr. Burnett's email.

[46] Mr. Burnett denied this statement within AmeriPort's paragraph sixty-four, because it was still a struggle to get through them even without an object in his hand. PRDSMF ¶ 65. The Court includes the original statement because it is supported by Mr. Burnett's deposition testimony but also includes Mr. Burnett's additional statement.

[47] Mr. Burnett objected to statements about ADA compliance because he alleges AmeriPort failed to respond to discovery requests about ADA compliance, leaving him unable to respond. PRDSMF ¶ 66. Mr. Burnett requests the Court deny AmeriPort's motion, disregard paragraph sixty-five, enter sanctions for failing to respond to discovery in good faith, or allow additional time for Mr. Burnett to take discovery on the issue. PRDSMF ¶ 66. If Mr. Burnett was unable to obtain the discovery material he needed, he should have followed the local rule by attempting to resolve the matter informally and then requesting a discovery conference. *See* D. ME. LOC. R. 26(b). The parties followed this process in August 2017 for another dispute before the close of the discovery period. *See Report of Hr'g and Order Re: Disc. Dispute and Status Conference* (ECF No. 51). The Court overrules Mr. Burnett's objection.
    Mr. Burnett also denied this statement, indicating the doors were installed before portions of the building were renovated and did not meet the newer updated standards. PRDSMF ¶ 66. AmeriPort's statement is supported by Mr. Burnett's own deposition testimony, and the citations in Mr. Burnett's denial speak to the time frame of the door installation, not to Mr. Burnett's knowledge of their compliance with ADA requirements. The Court includes AmeriPort's statement about Mr. Burnett's knowledge at the time, but does not make an inference as to the truth of the doors' compliance.

Ms. Dawson forwarded Mr. Burnett's email about the men's restroom, the heavy wood doors, and the lack of handicapped parking spaces to Tom Varley, who asked Ms. Dawson to "get with Ed"—an employee of the Marriott—to "order handicapped parking signs." PSAMF ¶ 49; DRPSAMF ¶ 49. Tom Varley gets paid by Hotel Providers, and his salary is charged back to PCFSI in order to shield his salary. PSAMF ¶ 50; DRPSAMF ¶ 50. In the email responding to Mr. Burnett's accessibility complaints, Tom Varley said he would "get with [B]illy we will need to address it all." PSAMF ¶ 51; DRPSAMF ¶ 51. Mr. Varley copied Cedric Rothkegel on this email, the manager of the HR department at PCFSI. PSAMF ¶ 52; DRPSAMF ¶ 52.

On August 28, 2014, Mr. Burnett sent a message to Nick Robertshaw requesting "that we need to put push button automatic doors in for the entry of [the] building," because the doors were heavy, and "hard to hold open" when Mr. Burnett would push himself through "without them closing" on him. PSAMF ¶ 53; DRPSAMF ¶ 53. At the time of the August 28, 2014 message, Mr. Robertshaw would have been one of Mr. Burnett's direct reservation supervisors he reported to on a day to day basis.[48] PSAMF ¶ 54; DRPSAMF ¶ 54. Ms. Dawson has no specific recollection of anyone saying to her that they followed up with Mr. Burnett about the heavy doors.[49] PSAMF ¶ 55; DRPSAMF ¶ 55.

---

[48]     AmeriPort denied the original statement, which referred to Mr. "Robertson" rather than "Robertshaw," saying, "There was no Mr. Robertson employed by AmeriPort." DRPSAMF ¶ 54. The Court corrects the apparent typographical error and includes Mr. Burnett's statement.

[49]     Mr. Burnett's original statement read, "Joyce Dawson has no specific recollection of anyone following up with Mr. Burnett about the heavy doors." PSAMF ¶ 55. AmeriPort offered a qualified

Ms. Darsaoui asked a contractor who works for Defendants, Mark Mooney, whether the doors were ADA compliant. PSAMF ¶ 56; DRPSAMF ¶ 56. Mr. Mooney did not respond to Ms. Darsaoui's inquiry about this issue for twenty days. PSAMF ¶ 57; DRPSAMF ¶ 57. On September 10, 2014, Ms. Darsaoui followed up with contractor Mark Mooney to determine whether the set of large wooden doors to enter the lobby of the hotel's clubhouse were compliant with the ADA, and Mooney responded, "as constructed when the building was built, yes."[50] DSMF ¶ 66; PRDSMF ¶ 67; PSAMF ¶ 58; DRPSAMF ¶ 58. Ms. Darsaoui does not know what steps were taken to make the doors ADA compliant, or whether a study was conducted to test the push/pull weight of the doors.[51] PSAMF ¶ 59; DRPSAMF ¶ 59. Ms. Darsaoui does not recall having a conversation with Mr. Burnett responding to his complaint about the heavy wood doors.[52] PSAMF ¶¶ 59, 62; DRPSAMF ¶¶ 59, 62;

Mr. Burnett hurt himself trying to open the heavy wood doors that he had complained about and had asked to have replaced.[53] PSAMF ¶ 60; DRPSAMF ¶ 60.

admission: "Dawson stated that she was not further involved with the automatic door request, and she did not recall anyone specifically telling her that they addressed the issue with Burnett . . . . However, she would have expected that someone followed up with Burnett." DRPSAMF ¶ 55. The Court modifies the original statement to hew more closely to the actual deposition testimony and resolve the qualification.

[50] Mr. Burnett objected to this statement and denied it. PRDSMF ¶ 67. For the reasons explained in footnote fifty, the Court overrules Mr. Burnett's objections and includes the statement.

[51] AmeriPort offered a qualified admission to point out that while Ms. Darsaoui was unaware of that knowledge, Mark Mooney would have been aware, but Mr. Burnett chose not to depose Mr. Mooney. DRPSAMF ¶ 58. Because the statement accurately reflects that Ms. Darsaoui did not have the information, the Court rejects the qualification.

[52] AmeriPort denied this statement in part, seeking to clarify that Ms. Darsaoui said it was her practice to follow-up with associates on topics like this, but she could not recall specifically having that conversation. DRPSAMF ¶¶ 59, 62. Since the statement is accurate, the Court rejects the qualification and includes the statement.

[53] AmeriPort offered a qualified admission but sought to clarify that Mr. Burnett's coffee mug slipped and he tried to grab it while holding onto the door, and that he did not seek medical attention,

19

Automatic doors were installed after Mr. Burnett's resignation.[54] DSMF ¶ 67; DRPSMF ¶ 68.

## H.    Questioning about Time Spent in the Bathroom

In his Amended Complaint, Mr. Burnett alleged that he was "humiliated" after his then-manager was critical for his taking too long to use the bathroom during a shift. DSMF ¶ 68; PRDSMF ¶ 69. This discussion took place in one of Mr. Burnett's supervisor's office at the start of his annual performance review. DSMF ¶ 69; PRDSMF ¶ 70. Mr. Burnett's supervisor asked whether it took him longer than most to use the restroom. DSMF ¶ 69; PRDSMF ¶ 70. When he responded "yes," the manager said that she would not ask him any further questions due to medical

---

did not have any lasting injury, and did not file a workers' compensation claim. DRPSAMF ¶ 60. The Court is aware of these additional facts from its review of Mr. Burnett's deposition testimony, but since the original statement does not specify the magnitude or seriousness of the injury, the statement is accurate and the Court rejects the qualification.

[54]    Mr. Burnett objected to this statement, repeating his request for more discovery. PRDSMF ¶ 68. For the reasons explained in footnote fifty, the Court overrules Mr. Burnett's objections and includes the statement.

Mr. Burnett also says he "lacks sufficient information to admit or deny this statement" about what happened after his resignation. PRDSMF ¶ 68.

Local Rule 56(b) requires a party moving for summary judgment to file a statement of material facts, with a record citation supporting each separate fact. D. Me. Loc. R. 56(b). Local Rule 56(c) provides that a party opposing a motion for summary judgment shall admit, deny, or qualify the movant's statement of material facts and, unless a fact is admitted, "shall support each denial or qualification by a record citation as required by this rule." D. Me. Loc. R. 56(c). Similarly, Local Rule 56(d) provides that the movant's reply to the opposing statement of facts shall admit, deny, or qualify the opposing party's additional facts and "shall support each denial or qualification by a record citation[.]" D. Me. Loc. R. 56(d). According to Local Rule 56(f), "[f]acts contained in a supporting or opposing statement of material facts, if supported by record citations as required by this rule, shall be deemed admitted unless properly controverted." D. Me. Loc. R. 56(f).

Here, a record citation supports the proposed statement. The opposing statement, however, does not provide a record citation and therefore fails to properly controvert the Plaintiff's proposed fact. Pursuant to Local Rule 56(f), the statement is deemed admitted. *See also Chapman v. Finnegan*, 950 F. Supp. 2d 285, 292 (D. Mass. 2013) ("A party opposing summary judgment cannot create a genuine issue of fact by denying statements, which the moving party contends are undisputed and supported by sufficient evidence, on the basis that he lacks knowledge and information to admit or deny the statement").

privacy laws, but she may need a doctor's note to verify his statement.[55]  DSMF ¶ 69;
PRDSMF ¶ 70.

The supervisor continued Mr. Burnett's annual performance review and,
according to Mr. Burnett, there was nothing discriminatory or concerning about the
rest of the review.[56]  DSMF ¶ 70; PRDSMF ¶ 71.  In fact, Mr. Burnett received the
highest score of his AmeriPort career in his 2014 performance review.  DSMF ¶ 70;
PRDSMF ¶ 71.  The subject of time spent in the bathroom was never brought up
again.  DSMF ¶ 69; PRDSMF ¶ 70.

## I.    The Unexpected Elevator Malfunction

On or about February 20, 2015, AmeriPort's elevator at its new location was
improperly locked and was inaccessible to anyone using it.  DSMF ¶ 72; PRDSMF ¶
73. Mr. Burnett reported to work that morning and was informed by his morning
supervisor that the elevator was out of service.  DSMF ¶ 72; PRDSMF ¶ 73.  Mr.
Burnett was sent home because the elevator needed to be repaired.[57]  DSMF ¶ 72;
PRDSMF ¶ 73.  Later that day, Ms. Darsaoui called Mr. Burnett stating that the

---

[55]     AmeriPort's original sentence read, "When he responded 'yes,' the manager assured him that
she would not ask him any further questions. . . ."  DSMF ¶ 69.  Mr. Burnett offered a qualified
admission to AmeriPort's paragraph but took issue with this sentence because the supervisor actually
said that HIPAA prevented her from asking further questions.  PRDSMF ¶ 70.  Because the Court
must adopt Mr. Burnett's version of the facts, the Court modifies the statement to incorporate Mr.
Burnett's qualification.
[56]     Mr. Burnett denied AmeriPort's' original statement, which did not specify that Mr. Burnett
believed there was nothing discriminatory or concerning "about the rest" of the review.  PRDSMF ¶
71.  The Court adds the phrase "about the rest" to resolve the denial and remove any ambiguity that
Mr. Burnett's feelings about his "review" did not extend to the bathroom questioning.
[57]     Mr. Burnett admitted the other portions of AmeriPort's paragraph but took issue with the final
words of the statement, which originally ended with: "sent home until the elevator could be repaired."
PRDSMF ¶ 73.  Mr. Burnett disputed this durational language because, by the time Ms. Darsaoui
called Mr. Burnett to tell him the elevator was fixed, there was no way for him to come back to work
in time.  PRDSMF ¶ 73.  The Court modifies the original statement slightly to resolve the qualification.

elevator had been fixed and that he would be compensated for the four hours the elevator was out service, due to the inconvenience of having to come into work and then being sent home. DSMF ¶ 73; PRDSMF ¶ 74. Mr. Burnett told Ms. Darsaoui that he was not coming back in to work on the day that the elevator was down because "he was back at home" by the time the elevator was fixed, and "it was a very long distance." PSAMF ¶ 70; DRPSAMF ¶ 70.

Four days later, on February 24, 2015, Mr. Burnett sent a message to Ms. Dawson via AmeriPort's instant messaging system. DSMF ¶ 74; PRDSMF ¶ 75. Mr. Burnett stated that Ms. Darsaoui informed him that he would be paid for four hours of the scheduled seven hour shift, even though no actual work was performed. DSMF ¶ 74; PRDSMF ¶ 75. However, Mr. Burnett complained that he should have been paid the full six and a half hours (seven hours less a half-hour lunch break) that he would have been paid had the elevator been in service. DSMF ¶ 75; PRDSMF ¶ 76.

On February 24, 2015, Mr. Burnett sent a message to Ms. Dawson explaining that the elevator was not working "last Friday," when he was scheduled to work from 7 am to 2 pm. PSAMF ¶ 63; DRPSAMF ¶ 63. Mr. Burnett's message to Ms. Dawson further explained that his supervisor, Nick Robertshaw, was notified, and Mr. Robertshaw told Mr. Burnett to "go home" because "there was nothing he could do." PSAMF ¶ 64; DRPSAMF ¶ 64. Mr. Burnett filled out a "missed punch" for the 7-hour shift that he missed. PSAMF ¶ 65; DRPSAMF ¶ 65.

Approximately one week after the February 20, 2015 incident with AmeriPort's elevator, Ms. Dawson held a meeting with Ms. Darsaoui and Mr. Burnett to discuss

his concerns with being paid for the full seven-hour shift.  DSMF ¶ 76; PRDSMF ¶ 77.  During the meeting, Ms. Dawson explained to Mr. Burnett that sometimes things were going to happen out of AmeriPort's control, but if Mr. Burnett would work with them, they could find solutions to overcome these problems.[58]  DSMF ¶ 77; PRDSMF ¶ 78.  Ms. Dawson recalled telling him that, because he was able to come back to work, "we were going to pay him for . . . the inconvenience of when he couldn't come to work and he was able to work the rest of his shift."  PSAMF ¶ 67; DRPSAMF ¶ 67. Mr. Burnett explained to Ms. Dawson that the situation was something beyond his control, and "not the first time" he had lost hours due to something out of his control. PSAMF ¶ 66; DRPSAMF ¶ 66.  Mr. Burnett therefore requested to be paid for six-and-one-half hours (seven hours, minus a lunch break).  PSAMF ¶ 66; DRPSAMF ¶ 66.  Ms. Dawson told Mr. Burnett that she was going to request he be paid for four hours, but not the seven he would have worked.  PSAMF ¶ 65; DRPSAMF ¶ 65.

Ms. Dawson's conversation with Mr. Burnett about not being paid for his full shift due to the elevator malfunction was very brief.  PSAMF ¶ 73; DRPSAMF ¶ 73. In making the decision to pay Mr. Burnett for less than the entire shift, Ms. Dawson did not take into consideration where or how far away he lived, and did not recall having a conversation with Mr. Robertshaw or Ms. Darsaoui about the issue.[59]

---

[58]     Mr. Burnett admitted "the nature of the conversation" but offered a qualification: "denied that 'things' were out of Defendants' 'control,' or that they offered to 'find solutions' since Mr. Burnett was not paid for his full shift.  PRDSMF ¶ 78.  The Court understands that Mr. Burnett was not satisfied with the resolution and did not consider this an adequate solution, but the Court includes the statement because it appears to accurately represent what the parties said at the meeting.

[59]     AmeriPort offered a qualified admission to specify that Ms. Dawson took Mr. Burnett at his word that Mr. Robertshaw told him to go home, DRPSAMF ¶ 68, and AmeriPort cites Ms. Darsaoui's testimony that indicates the two women did have a conversation.  DRPSAMF ¶ 69.  Mr. Burnett's

PSAMF ¶¶ 68; DRPSAMF ¶¶ 68, 69. Although Mr. Burnett complained that it was "not the first time" things had happened that were out of his control, Ms. Dawson did not undertake an investigation into that complaint.[60] PSAMF ¶ 73; DRPSAMF ¶ 73.

On this particular occasion, AmeriPort decided to pay Mr. Burnett for the four hours that the elevator was out service due to inconvenience of Mr. Burnett having to report to work, but not for the full shift. DSMF ¶ 77; PRDSMF ¶ 78; PSAMF ¶ 71; DRPSAMF ¶ 71. Ms. Dawson knew that Mr. Burnett was displeased with the decision to not pay him for the entire missed shift. PSAMF ¶ 72; DRPSAMF ¶ 72.

## J. The Expected Elevator Repairs

In or around March of 2015, AmeriPort informed its employees that its elevator would be out of service for a couple of weeks due to a repair to begin on May 26, 2015. DSMF ¶ 79; PRDSMF ¶ 80. One employee in addition to Mr. Burnett required the elevator to work on the second floor. DSMF ¶ 79; PRDSMF ¶ 80. During the repair, Mr. Burnett and the other employee were placed in a workspace on the first floor.[61] DSMF ¶ 79; PRDSMF ¶ 80. Mr. Burnett was asked to do a walkthrough of the

---

[60] statement about Ms. Dawson's recollection of conversations with Ms. Darsaoui is supported by Ms. Dawson's testimony, so the Court rejects that qualification. The original statement also specified that Ms. Dawson did not consider whether it was true that his supervisor, Mr. Robertshaw, told him to go home. PSAMF ¶ 68. The record indicates that Ms. Dawson did not have a conversation with Mr. Robertshaw to verify Mr. Burnett's claims, but did take Mr. Burnett at his word. Mr. Burnett presents no evidence to contradict Ms. Dawson's testimony. Accordingly, the Court modifies the statement to hew more closely to the actual deposition testimony and to reconcile the statements.

[60] AmeriPort offers a qualification because Ms. Dawson did not recall Mr. Burnett mentioning any past accessibility issues. DRPSAMF ¶ 73. Consistent with its duty to view contested facts in favor of the nonmoving party, the Court rejects the qualification.

[61] Mr. Burnett admitted much of Defendants' paragraph but offered a qualification: "Denied that this was a 'workspace' that met Mr. Burnett's needs." PRDSMF ¶ 80. Mr. Burnett provided additional details as to why he was unsatisfied with the "makeshift space." PRDSMF ¶ 80. The Court resolves the qualification by drawing no inferences about Mr. Burnett's satisfaction with the makeshift space but includes the statement because "workspace" appears to be an accurate descriptor; it was a "space" in which Mr. Burnett "worked."

workspace to determine if it met his needs. DSMF ¶ 80; PRDSMF ¶ 81. Mr. Burnett noted that his desk was not accessible due to its height. DSMF ¶ 80; PRDSMF ¶ 81. Mr. Burnett reported the issue to Shift Leader Eric Meserve, who in turn reported the issue to Ms. Darsaoui. DSMF ¶ 80; PRDSMF ¶ 81. Maintenance Specialist Dwayne Haskell was also aware. DSMF ¶ 80; PRDSMF ¶ 81.

On May 2, 2015, the elevator quit working, and the scheduled elevator repair was suddenly moved up from May 26, 2015 to May 5, 2015. DSMF ¶ 81; PRDSMF ¶ 82. Mr. Burnett was scheduled to work on May 5, 2015, and when he reported to the new workspace that day, there was an issue with the desk. DSMF ¶ 81; PRDSMF ¶ 82. When Mr. Burnett noted the issue, the desk was fixed the same day.[62] DSMF ¶ 81; PRDSMF ¶ 82. AmeriPort also staggered Mr. Burnett's and his coworkers' schedules, at Mr. Burnett's request, to provide more room in the temporary workspace.[63] DSMF ¶ 81; PRDSMF ¶ 82. AmeriPort also informed the custodial employee to ensure that the door to the pro shop was unlocked so that Mr. Burnett had access to the handicapped accessible restroom there. DSMF ¶ 82; PRDSMF ¶ 83.

Mr. Burnett's was not satisfied with the situation because he felt segregated, had to ask a supervisor to bring him water, and the company "could have had a

---

[62]    Mr. Burnett offered a qualification because the original statement ended with the phrase "in order to accommodate him." PRDSMF ¶ 82. Because "accommodate" is a legal characterization, the Court resolves the qualification by omitting the phrase.

[63]    Mr. Burnett offered a qualification because of the word "accommodate," and to explain that he was not satisfied with the workspace and felt segregated from other employees. PRDSMF ¶ 82. For the reasons explained in footnote sixty-two, the Court includes the statement but omits the word "accommodate," and, concerning Mr. Burnett's satisfaction with the workspace, the Court draws no inferences from AmeriPort's statement.

microwave available or something of this sort" since the breakroom was on an upper level.[64]  DSMF ¶ 83; PRDSMF ¶ 84.  However, Mr. Burnett never requested a microwave.[65]  DSMF ¶ 83; PRDSMF ¶ 84.  AmeriPort created a makeshift break area for Mr. Burnett in the pro shop, but because it was sometimes locked, he could not always access it, and when it was locked, he did not ask anyone to unlock it.[66]  DSMF ¶ 84; PRDSMF ¶ 85.  When asked during his deposition whether there was anything Mr. Burnett requested while he was in the temporary workspace that he had not received, Mr. Burnett responded, "No."[67]  DSMF ¶ 85; PRDSMF ¶ 86.

### K.  Attendance and Tardiness Issues

#### 1.  Requests for Time Off in Advance

Whenever an employee needed two or more consecutive shifts off from work, AmeriPort's policy provided that the employee could request in advance not to be put on the schedule. [68]  DSMF ¶ 14; PRDSMF ¶ 14.  Mr. Burnett availed himself of this

---

[64]     AmeriPort's original statement said that Mr. Burnett's "only complaint" was that he felt segregated and the company could have had a microwave available.  DSMF ¶ 83.  Mr. Burnett denied that statement because Mr. Burnett was also dissatisfied with the lack of access to water "or anything else" while working on the first floor.  PRDSMF ¶ 84.  The Court does not know what Mr. Burnett refers to when he says he lacked access to "anything else" but otherwise resolves any tension between AmeriPort's statement and Mr. Burnett's explanation in Mr. Burnett's favor by deleting the words, "only complaint" and adding his lack of access to drinking water.

[65]     AmeriPort's original statement said that Mr. Burnett never requested "such an accommodation."  DSMF ¶ 83.  Mr. Burnett denied this statement because "it was not Mr. Burnett's responsibility to ask for such an accommodation."  PRDSMF ¶ 84.  For the reasons explained in footnote sixty-two, the Court omits the word "accommodation."

[66]     Mr. Burnett denied AmeriPort's original statement, which only said that AmeriPort created a makeshift break area in the pro shop.  PRDSMF ¶ 85.  Mr. Burnett cited the previous few denial paragraphs.  PRDSMF ¶ 85.  The Court modifies the statement to more closely track Mr. Burnett's actual deposition testimony.

[67]     Mr. Burnett denied this statement, citing the previous few denials.  PRDSMF ¶ 86.  The Court includes the statement because it accurately reflects Mr. Burnett's deposition testimony, but consistent with its duty to view the facts in the light most favorable to Mr. Burnett, the Court is mindful of Mr. Burnett's dissatisfaction with the temporary workspace arrangement.

[68]     AmeriPort's paragraph originally read:

policy on several occasions during his employment with AmeriPort. DSMF ¶ 14; PRDSMF ¶ 14. On at least two occasions in 2012 and 2013, Mr. Burnett requested time off in advance specifically to address issues relating to his disability. DSMF ¶ 14; PRDSMF ¶ 14. Both requests were approved without issue.[69] DSMF ¶ 14; PRDSMF ¶ 14. Throughout his employment with AmeriPort, Mr. Burnett also took time off for doctor's appointments. DSMF ¶ 14; PRDSMF ¶ 14. AmeriPort approved all of Mr. Burnett's requests, when the requests were in advance and were for reasons related to his disability.[70] DSMF ¶ 15; PRDSMF ¶ 15. Mr. Burnett was also never disciplined for taking time off with advance notice due to his disability.[71] DSMF ¶

> Whenever an employee needed two or more consecutive shifts off from work, AmeriPort's policy provided that the employee could request time off in advance. Burnett availed himself of this policy on several occasions during his employment with AmeriPort. On at least two occasions in 2012 and 2013, Burnett requested time off specifically to address issues relating to his disability. Both requests were approved without issue. Throughout his employment with AmeriPort, Burnett also took time off for doctor's appointments.

DSMF ¶ 14. Mr. Burnett offered a qualification, clarifying that since he worked less than thirty-two hours per week and did not get paid time off, these were actually requests not to be put on the schedule to work, rather than requests for "time off." PRDSMF ¶ 14. The Court modifies the statement to resolve the qualification.

[69] Mr. Burnett also denies that the requests were "approved without issue" for reasons discussed in Mr. Burnett's response to the Defendant's paragraph twelve. PRDSMF ¶ 14. Paragraph twelve, however, disputes whether last minute requests to miss scheduled shifts were "approved" because they were cited in Mr. Burnett's later corrective action, rather than requests not to be put on the schedule. PRDSMF ¶ 12. Paragraph twelve, in-turn, cites AmeriPort's paragraph 25, which describes a corrective action that contained reference to a tardy arrival that was labelled "excused." PRDSMF ¶ 12; DSMF ¶ 25; *see* footnote seventy-three. The Court sees no indication that Mr. Burnett received corrective actions for these requests in advance *to not be put on the schedule*, in contrast to requests, at the last minute, or tardy arrivals, to miss a *scheduled* shift. In light of this distinction, even despite the deference due to non-movants at summary judgment, the Court rejects the denial and includes the statement because it is uncontradicted in the record.

[70] Mr. Burnett denied this statement, PRDSMF ¶ 15, but the Court rejects the denial for the reasons explained in footnote sixty-nine. But the Court also modifies the statement for additional clarity that it refers only to Mr. Burnett's requests in advance and does not refer to tardy arrivals or absences without advance notice.

[71] Mr. Burnett denied this statement, citing several instances on his corrective action where he was cited for arriving late, which he argues were for things "out of his control due to his disability." PRDSAMF ¶ 16. The Court rejects the denial for the reasons explained in footnote sixty-nine, but the

16; PRDSMF ¶ 16. In or around the beginning of 2014, AmeriPort switched to an electronic system for time off requests. DSMF ¶ 17; PRDSMF ¶ 17. Mr. Burnett availed himself of this system several times for, among other things, medical issues related to his disability. DSMF ¶ 17; PRDSMF ¶ 17. Mr. Burnett testified that he never had any issues with requesting time in advance off due to a medical condition or his disability.[72] DSMF ¶ 17; PRDSMF ¶ 17.

## 2. Tardiness Issues without Advance Notice

AmeriPort maintained a call out policy which required any employee unable to come to work to call out for his or her shift at least two hours prior to the start of the shift, absent an emergency. DSMF ¶ 11; PRDSMF ¶ 11.[73] AmeriPort's call-out policy also provided that if the employee had any questions or concerns, the employee should contact his or her direct supervisor or Human Resources Manager. DSMF ¶ 13; PRDSMF ¶ 13. Mr. Burnett admits that being on time for his shift was an important part of his job.[74] DSMF ¶ 26; PRDSMF ¶ 26. The Reservations Agent job description

Court modifies the statement for additional clarity that it refers only to Mr. Burnett's requests in advance, and does not refer to tardy arrivals or absences without advance notice.

[72] Mr. Burnett offered a qualified admission but took issue with the phrase "never had any issue" with requesting time off. PRDSMF ¶ 17. The Court rejects the qualification for the reasons explained in footnote sixty-nine. But the Court also modifies the statement to clarify that it refers only to Mr. Burnett's requests in advance and not to tardy arrivals or absences without advance notice.

[73] AmeriPort sought to include, "However, because AmeriPort's offices did not open until 7 a.m., Burnett was permitted to call out at 7 a.m. once the office opened on the days when he was scheduled to work from 7 a.m. to 3 p.m." DSMF ¶ 12. Mr. Burnett denied this statement, citing AmeriPort's paragraph 25, which describes a corrective action that contained reference to a tardy arrival labelled "excused." PRDSMF ¶ 12; DSMF ¶ 25. It is not clear from this record whether the corrective action's reference to the "excused" tardy arrival was meant to exclude that incident from discipline, or whether its inclusion meant it was counted against Mr. Burnett. Because the Court must adopt Mr. Burnett's version of contested facts at summary judgment, the Court assumes the incident was held against Mr. Burnett, which means he was not always "permitted" to call out at 7 a.m. for a 7 a.m. shift and, therefore, omits the statement.

[74] AmeriPort's original statement read, "Burnett admits that being on time for his shift was an important part and an essential function of his job." DSMF ¶ 26. Mr. Burnett denied this statement,

28

also provided that Mr. Burnett was required to arrive to work on time.[75]  DSMF ¶ 26;

PRDSMF ¶ 26.  AmeriPort enforces its attendance policy for all employees, including

its reservation agents.[76]  DSMF ¶ 30; PRDSMF ¶ 30.

Mr. Burnett generally worked AmeriPort's opening shift from 7 a.m. to 3 p.m.

DSMF ¶ 27; PRDSMF ¶ 27.  If Mr. Burnett was absent, there may not have been

sufficient capacity to receive a customer's reservation or inquiry, as there were often

only three to four individuals assigned to the morning shifts.[77]  DSMF ¶ 28; PRDSMF

¶ 28.  On other occasions, there was only one other reservation agent in the office

when Mr. Burnett arrived to work.  DSMF ¶ 28; PRDSMF ¶ 28.

---

despite Mr. Burnett's admission to the contrary, citing positive performance reviews and other evidence that the call center deployed strategies like staggered shifts and accepted high turnover rates because poor attendance records for Reservations Agents was typical.  PRDSMF ¶ 26.  AmeriPort's own paragraph twenty-eight indicates that there were other occasions where only one other Reservation Agent was working when Mr. Burnett arrived, even though three or four employees are scheduled to work that shift, indicating that it was not a rare occurrence for other Reservation Agents to arrive late or miss shifts.  DSMF ¶ 28.  There is enough evidence in the record to create a genuine dispute as to the exact scope of the essential duties for Reservation Agents, despite Mr. Burnett's deposition testimony to the contrary.  Accordingly, the Court omitted that particular phrase and limited the statement to Mr. Burnett's admission that attendance is important.

[75]     Mr. Burnett denied this statement because the description does not include arriving to work on time under the location where "essential functions" are listed.  PRDSMF ¶ 26.  The statement does not specify that the job description included it as an "essential function," only that it was listed in the description.  Accordingly, the Court rejects the denial.

[76]     Mr. Burnett objected to this statement, seeking further discovery from Defendants on the issue of other employees' attendance.  For the reasons described in footnote fifty, the Court overrules the objection.

[77]     AmeriPort's original statement read, "If Burnett was absent, there may not have been anyone to receive a customer's reservation or inquiry, as there were often only three to four individuals assigned to the morning shifts.  On other occasions, there was only one other reservation agent in the office when Burnett arrived to work."  DSMF ¶ 28.  Mr. Burnett denied this statement, explaining that there were typically three to five people starting their shifts with Mr. Burnett, with shifts staggered roughly every thirty minutes so different employees arrived throughout the day.  PRDSMF ¶ 28.  Mr. Burnett appears to take issue with the implication that "no one" would be available to receive calls if he were tardy.  PRDSMF ¶ 28 ("If only one person was working when Mr. Burnett arrived, it is because other people were late as well").  The Court modifies the statement to refer to the call center's "capacity" to receive calls, which captures the undisputed core of the two statements: there were other employees working and tardiness was still of concern to management.

Mr. Burnett received several corrective actions during his employment with AmeriPort for various issues, including reporting late to work. DSMF ¶ 18; PRDSMF ¶ 18. AmeriPort documented Mr. Burnett's full attendance record in his corrective actions, including days he called out and was excused.[78] DSMF ¶ 23; PRDSMF ¶ 23; PSAMF ¶¶ 18-19; DRPSAMF ¶¶ 18-19. Specifically, Mr. Burnett received corrective actions on: (1) August 13, 2009; (2) September 27, 2010; (3) November 30, 2010; (4) March 25, 2012; (5) June 24, 2012; (6) August 6, 2012; (7) August 13, 2014; (8) October 12, 2014; (9) March 17, 2015; and (10) December 14, 2015. DSMF ¶ 18; PRDSMF ¶ 18. The corrective actions Mr. Burnett received on September 27, 2010; March 25, 2012; June 24, 2012; August 13, 2014; and March 17, 2015, all related to Mr. Burnett's tardiness and absenteeism from work. DSMF ¶ 19; PRDSMF ¶ 19. Each corrective action had a space for associate comments where Mr. Burnett could have reported that his tardiness was related to his disability, but Mr. Burnett never reported any such comments.[79] DSMF ¶ 31; PRDSMF ¶ 31.

In the corrective action Mr. Burnett received on September 27, 2010, his full attendance record over the past 60 days was documented, including the July 12, 2010,

---

[78] AmeriPort's original statement also said, ". . . but Burnett was only disciplined for those days where no excuse was given for his tardiness or absenteeism." DSMF ¶ 23; see also DRPSAMF ¶¶ 18-19. Mr. Burnett denied this statement, citing the references to excused absences in the corrective actions. PRDSMF ¶ 23. For the reasons described in footnote seventy-three, the Court omits the statement, consistent with Mr. Burnett's view of the disputed fact.

[79] Mr. Burnett denied this statement, maintaining that "Mr. Burnett never wrote on these corrective actions because he knew it would not make a difference; no matter what he wrote, Mr. Burnett was still going to get the corrective action," and that he did tell supervisors at other times that certain absences or tardiness was personal, medical, or both. PRDSMF ¶ 31. The statement makes no claim about Mr. Burnett's motives, only that he did not write in the space provided, which Mr. Burnett's statement of denial seems to admit. Accordingly, the Court rejects the denial.

tardy that was labeled "excused" and the July 17, 2010 tardy labeled "(chair lift) excused."[80]  DSMF ¶ 25; PRDSMF ¶ 25.  During a two-month period in 2010, Mr. Burnett was late to or absent from his shift twenty-five times.[81]  DSMF ¶ 20; PRDSMF ¶ 20.  Most employees do not like to be written up, especially for things out of their control, such as a wheelchair lift issue in Mr. Burnett's truck causing him to miss work.[82]  PSAMF ¶ 16; DRPSAMF ¶ 16.

In the first corrective action dated September 27, 2010, AmeriPort stated: "If Ryan needs to adjust his availability in order to avoid be[ing] tardy he should consider this option right away."  DSMF ¶ 21; PRDSMF ¶ 21.  Mr. Burnett never requested a

---

[80]    Mr. Burnett denied this statement, contending, "These absences were not just 'documented' but formed part of his corrective action . . . ."  PRDSMF ¶ 25.  This statement only claims the incidents were "documented."  Mr. Burnett's view, that the incidents were "documented" and also "formed part of his corrective action," is not inconsistent with AmeriPort's statement that incidents were "documented."  Accordingly, the Court rejects the denial and includes the statement, but for the reasons described in footnote seventy-three, the Court adopts Mr. Burnett's inference that the incidents marked as "excused" were part of the basis of his corrective action.

[81]    Mr. Burnett denied this statement:
       Denied.  In DSMF ¶¶ 23-25, OPL contends that Plaintiff was never disciplined for "excused" absences related to his disability.  However, DSMF ¶ 20 attempts to hold Plaintiff accountable for inexcusable attendance problems on 25 separate occasions, three of which were disability or sickness related.  The remaining 22 attendance issues cited in September of 2010 involved tardiness, many of which were also related to Plaintiff's disability.  Furthermore, tardiness by reservation agents was a common occurrence.  Mr. Burnett observed his co-workers being late to work often, and to his knowledge they were not disciplined as harshly as he was; in fact, one chronically tardy employee was rehired by Defendants.
PRDSMF ¶ 20.  Despite the additional arguments, Mr. Burnett does not appear to seriously dispute that he was in fact tardy or absent on the twenty-five occasions in the two-month period.  The additional explanation admits those twenty-five occasions did occur.  Since Mr. Burnett's real dispute is with the implications of this fact, and not the veracity of the statement itself, the Court rejects the denial.

[82]    AmeriPort offered a qualification to point out that different employees interpret corrective actions differently and reiterated their position that they only reported Mr. Burnett's excused absences in the corrective action forms for documentary purposes, but those were not held against him.  DRPSAMF ¶ 16.  For the reasons explained in footnote seventy-three, the Court rejects the qualification and includes the statement.

different schedule; he preferred the 7 a.m. shift.  DSMF ¶ 22; PRDSMF ¶ 22; DSMF ¶ 36; PRDSMF ¶ 36.

In December 2014, Mr. Burnett received a positive performance review, earning a 3.5 out of a possible 5 points in his evaluation—the highest score Mr. Burnett had ever achieved during his employment with AmeriPort.  DSMF ¶ 34; PRDSMF ¶ 34.  Under the section entitled "Developmental Areas: What Specific Aspects of Performance Need Improvement," Mr. Burnett's then office manager, Laura Chakirelis, wrote that "Ryan has a habit of being late to work which is beginning to become a consistant (sic) occurance (sic)."  DSMF ¶ 34; PRDSMF ¶ 34. In this performance review, AmeriPort again suggested that if he could not arrive to work on time, Mr. Burnett should alter his availability to better suit his personal schedule.  DSMF ¶ 35; PRDSMF ¶ 35.  Mr. Burnett testified that he found nothing in this performance review to be discriminatory.[83]  DSMF ¶ 35; PRDSMF ¶ 35.

Mr. Burnett testified that he often would tell his supervisors that he was absent for "personal" reasons or "medical" reasons, depending on his comfort level with that supervisor.  DSMF ¶ 38; PRDSMF ¶¶ 38-39.  Mr. Burnett claimed that on some days when he had bladder or bowel function issues, he would not be able to attend work for the day because the "personal issue usually last[ed] 24 to 48 hours

---

[83]     Mr. Burnett denied this portion of AmeriPort's paragraph thirty-five, pointing to another portion of Mr. Burnett's testimony that he found it discriminatory that Defendants wrote him up continuously when they knew he had a proven medical condition.  PRDSMF ¶ 35.  The statement accurately reflects Mr. Burnett's deposition testimony, so the Court rejects the denial.

that I needed to deal with and take care of myself and make sure I stay[ed] clean."[84] DSMF ¶ 37; PRDSMF ¶ 37.  Mr. Burnett testified that when he had an issue related to his disability, he would say it was "personal" or "medical" and if he was sick, he would say he was "sick."  *Notice of Filing* Attach 1 *Dep. of Ryan D. Burnett* (ECF No. 67) 118:24-120:9 (*Burnett Dep.*).  Mr. Burnett testified that he did not tell anybody that the word "personal" or "medical" meant it was related to his disability.[85]  Burnett Dep. 118:24-120:9; DSMF ¶ 39; PRDSMF ¶ 39.

Ms. Darsaoui discussed with Ms. Dawson that disability-related absences like when Mr. Burnett could not get to work because his handicapped accessible truck broke down and a part had to be replaced should not "count" as part of his corrective action, but they did not discuss whether such disability-related reasons for being absent should be "on the corrective action form."[86]  PSAMF ¶ 17; DRPSAMF ¶ 17. Other than when she met with Mr. Burnett to give him employee discipline, Ms. Darsaoui never approached Mr. Burnett privately to ask him what was going on with his attendance, and she was not the person he was supposed to speak with when he called out for a particular shift.[87]  PSAMF ¶ 21; DRPSAMF ¶ 21.  Mr. Burnett never

---

[84]     Mr. Burnett denied this statement, seeking to clarify that sometimes these issues only made Mr. Burnett late, rather than causing him to miss an entire shift.  PRDSMF ¶ 37.  The Court modifies the statement to refer to "some days" rather than "those days" in the original statement in order to resolve the denial.

[85]     Mr. Burnett denied AmeriPort's paragraph thirty-nine, seeking to clarify Mr. Burnett's different uses of "medical" and "personal."  PRDSMF ¶ 39.  The Court includes an additional statement from Mr. Burnett's deposition to clarify these statements and resolve the denial.

[86]     AmeriPort offered a qualification, admitting that all the absences were documented, but maintaining that the excused instances were not held against Mr. Burnett.  DRPSAMF ¶ 17.  For the reasons discussed in footnote seventy-three, the Court adopts Mr. Burnett's version of that contested fact and rejects the qualification.

[87]     AmeriPort offered a qualification, reiterating their view that Mr. Burnett was not disciplined for excused incidents, and that Mr. Burnett could have informed her if there were additional disability-

expressed to Ms. Darsaoui that his tardiness had anything to do with his disability.[88]

DSMF ¶ 33; PRDSMF ¶ 33.  Mr. Burnett never told Ms. Darsaoui nor Ms. Dawson

that he had no control over his bowel movements during his employment.[89]  DSMF ¶

6; PRDSMF ¶ 6.

Regardless of the reason Mr. Burnett provided to his shift supervisor when he

called out from work, Ms. Dawson would not be notified of the reason for the callout,

including when the callouts were the basis for employee discipline.[90]  PSAMF ¶ 23;

DRPSAMF ¶ 23.  Ms. Dawson does not recall "anyone specifically coming to [her] and

saying Mr. Burnett is late all time."  PSAMF ¶ 24; DRPSAMF ¶ 24.

Mr. Burnett testified at his deposition that he could not identify any specific

dates on which he believes he was unfairly or discriminatorily disciplined for

disability-related problems, and which dates in his corrective actions were unrelated

---

related absences or tardees in the corrective action, but did not do so.  DRPSAMF ¶ 21.  For the reasons
discussed in footnote seventy-three, the Court rejects the qualification and includes the statement.

[88]    Mr. Burnett objected to this statement for misstating the evidence introduced by AmeriPort,
and denied the statement, offering explanation as to why Mr. Burnett never told Ms. Darsaoui that
his tardiness was sometimes related to his disability, or why Ms. Darsaoui should have known his
tardiness was related to his disability.  PRDSMF ¶ 33.  Mr. Burnett says, "The call out policy requires
reservation agents to call in to a supervisor, not Payroll/Human Resources like Darsaoui," and "OPL
should have known that Mr. Burnett had disability-related medical issues just by seeing that he used
a wheelchair, and presented doctor's notes on frequent occasions related to his medical condition."
PRDSMF ¶ 33.
        The Court overrules the objection and the denial because the statement accurately restates
Ms. Darsaoui's deposition testimony, which is uncontradicted in the record.  The rest of Mr. Burnett's
arguments about what Ms. Darsaoui should have known are not inconsistent with the statement that
he never explicitly told her his tardiness sometimes resulted from his disability.

[89]    This portion of Defendants original statement read, "Neither Darsaoui nor Dawson was aware
of the fact that Burnett had no control over his bowel movements during Burnett's employment."
DSMF ¶ 6.  Mr. Burnett admitted that Mr. Burnett never told Darsaoui or Dawson but denied that
they were not aware.  PRDSMF ¶ 6.  To resolve the denial, the Court modifies the statement to reflect
the undisputed area of overlap between the two competing paragraphs.

[90]    AmeriPort offered a qualification to point out that while Ms. Dawson was not notified of the
reasons, Ms. Darsaoui was notified.  DRPSAMF ¶ 23.  Since the qualification is not inconsistent with
Mr. Burnett's statement, the Court rejects the qualification and includes the statement.

to his disability.[91]  DSMF ¶ 24; PRDSMF ¶ 24.  Mr. Burnett testified that he does not

know how AmeriPort was supposed to address his attendance issues.[92]  DSMF ¶ 29;

PRDSMF ¶ 29. Mr. Burnett said he never told anyone he felt he was being

discriminated against when he received the corrective actions.[93]  DSMF ¶ 32;

PRDSMF ¶ 32.

### L.    Work for Another Department

In or around June 2015, Mr. Burnett went to work for the Foreign Independent

Travel (FIT) Department, where he predominantly took online reservations booking

for tour groups, rather than predominantly answering phone calls.[94]  DSMF ¶ 7;

PRDSMF ¶ 7.  During this time, Mr. Burnett reported to FIT manager Paul Levine.

DSMF ¶ 7; PRDSMF ¶ 7.

---

[91]    AmeriPort's original statement read, "Burnett cannot identify any specific dates on which he believes he was unfairly or discriminatorily disciplined."  DSMF ¶ 24.  Mr. Burnett denied this statement, listing the incidents described in several of the subsections of this summary of facts, and seeking to clarify that Mr. Burnett believes he was unfairly written up in corrective actions for disability-related medical incidents.  PRDSMF ¶ 24.  The Court modifies the statement to hew more closely to Mr. Burnett's actual deposition testimony.

[92]    Mr. Burnett denied this statement, citing his responses to paragraph twenty-six and twenty-eight.  The statement accurately reflect Mr. Burnett's deposition testimony, which indicates that he agrees that employers have an interest in ensuring reliable attendance for their employees, and also that he believes his employer could have done more to work out a better arrangement, but he does not know what a better arrangement might have looked like.  Accordingly, the Court includes the statement.

[93]    Mr. Burnett denied this statement, asserting that he "reported instances of discrimination, retaliation, and inaccessibility throughout his employment."  PRDSMF ¶ 32.  Because the statement accurately reflects Mr. Burnett's deposition testimony, the Court includes the statement.

[94]    The original statement read, "Eight months prior to his resignation, Burnett transferred to AmeriPort's Foreign Independent Travel ("FIT") department and, instead of answering phones, took online reservations from guests for various affiliated hotels and properties."  DSMF ¶ 7.  Mr. Burnett offered a qualification to specify that he did not fully "transfer" to this department and still answered some telephone reservations.  PRDSMF ¶ 7.  The Court modifies the statement to hew more closely to the deposition testimony and to resolve the qualification.

Mr. Burnett did not have any concerns or corrective actions during his months working in the FIT department, and his manager addressed any issues he had.[95] DSMF ¶ 8; PRDSMF ¶ 8. Mr. Burnett did not believe he was being discriminated against during his time working for the FIT department.[96] DSMF ¶ 9; PRDSMF ¶ 9.

### M. Mr. Burnett Files a Charge

On June 29, 2015, Mr. Burnett filed a complaint (Charge) with the Maine Human Rights Commission. *Pl.'s Opp'n to Defs.' Partial Mot. to Dismiss Am. Complaint and Opp'n to Mot. to Strike Impertinent Allegations* Attach 2 *Complaint of Discrimination* (ECF No. 23); DSMF ¶ 86; PRDSMF ¶ 87.[97] Mr. Burnett's Charge did not mention the rear door damage incident with the Mr. Reiter, the blocked access ramp incident, the snowstorm incident, the demand to move his truck incident, or the question about his time requirements in the bathroom.[98] DSMF ¶¶ 42, 49, 52, 60, 71; PRDSMF ¶¶ 42, 49, 52, 60, 72. After Mr. Burnett filed his Charge, Ms. Dawson

---

[95] Mr. Burnett denied this statement, citing his affidavit and other testimony that there was "one big continuous issue" with accessibility that was never fully resolved. PRDSMF ¶ 8. The Court modifies the statement slightly to hew more closely to the text of the deposition transcript, reflecting that no new issues arose during that time but otherwise includes the statement because it is supported by Mr. Burnett's testimony. Mr. Burnett testified to a lack of new problems during the last months of his employment; he cannot create a genuine dispute of fact regarding specific incidents during that time period by invoking vague or general assertions that it was all "one big continuous issue."

[96] Mr. Burnett denied this statement, citing his denial of AmeriPort's paragraph eight. For the reasons described in the previous footnote, the Court rejects the denial and includes the statement.

[97] AmeriPort also sought to include, "In his Amended Complaint, Burnett stated that he felt retaliated against for filing his Charge and requesting accommodations." DSMF ¶ 87. Mr. Burnett denied this statement because "the allegations . . . speak for themselves, and include 55 statements of material facts reciting the ways in which Mr. Burnett was discriminated and retaliated against. . . ." PRDSMF ¶ 88. The Court agrees that this paragraph restating an aspect of Mr. Burnett's complaint is not pertinent to this section of the order summarizing the facts. The Court addresses the complaint in the discussion section.

[98] AmeriPort said these incidents "were not part" of the Charge, which Mr. Burnett denied, characterizing his complaint as covering a series of ongoing incidents. PRDSMF ¶ 42. The Court modifies the original statement to resolve the denial and clarify that the Charge did not mention these incidents specifically.

instructed Ms. Darsaoui to pay Mr. Burnett for two and half days of missed time, but it is not clear for which instances this was designed to compensate.[99] DSMF ¶ 78; PRDSMF ¶ 79; PSAMF ¶ 74; DRPSAMF ¶ 74.[100]

When asked at his deposition as to what acts of retaliation had occurred after he filed his Charge on June 29, 2015, Mr. Burnett stated "I don't believe there was anything after this charge, as far as retaliation."[101] DSMF ¶ 88; PRDSMF ¶ 89. When asked whether he felt that he was treated differently as a result of his complaints or requests for accommodation, Mr. Burnett answered, "No, I never felt like they treated me differently."[102] DSMF ¶ 89; PRDSMF ¶ 90. When asked whether he ever felt that anyone retaliated against him as a result of his complaints or requests for accommodation, Mr. Burnett answered: "No."[103] DSMF ¶ 90; PRDSMF

---

[99]    AmeriPort's original statement referred to "the remaining hours" but did not specify which hours or incidents were covered. DSMF ¶ 78. Mr. Burnett offered a qualification, specifying that AmeriPort did send him a check for "missed work" but that it did not address other accessibility issues, like moving his truck, or the snowstorm, or the bathroom renovation, and Mr. Burnett never cashed the check. PRDSMF ¶ 79. Mr. Burnett also made a similar additional statement. PSAMF ¶ 74; DRPSAMF ¶ 74. The Court modifies the statement to reflect the undisputed portion of these related statements.

[100]    Mr. Burnett also sought to include, "Throughout his employment, Defendants never gave Mr. Burnett a form outlining his rights and responsibilities under the FMLA, or notifying him of his right to take intermittent leave under the FMLA." PSAMF ¶ 75. AmeriPort objected to this statement, arguing that it goes beyond the pleadings and seeks to introduce a new theory of liability never mentioned before. DRPSAMF ¶ 75. AmeriPort also denies the statement, arguing that the notification is contained in the employee handbook, which Mr. Burnett acknowledged receiving. DRPSAMF ¶ 75. The Court agrees that this statement is not relevant to the theories of liability contained in Mr. Burnett's amended complaint and, therefore, omits the statement.

[101]    Mr. Burnett denied this statement. PRDSMF ¶ 89. Because the statement accurately quotes Mr. Burnett's deposition testimony, and for the reasons discussed in footnote ninety-five, the Court rejects the denial and includes the statement.

[102]    Mr. Burnett denied this statement. PRDSMF ¶ 90. Because the statement accurately quotes Mr. Burnett's deposition testimony, and for the reasons discussed in footnote ninety-five, the Court rejects the denial and includes the statement.

[103]    Mr. Burnett denied this statement. PRDSMF ¶ 91. Because the statement accurately quotes Mr. Burnett's deposition testimony, and for the reasons discussed in footnote ninety-five, the Court rejects the denial and includes the statement.

¶ 91. Mr. Burnett testified that each of his requests for accommodation during the course of his employment with AmeriPort were ultimately fixed after some time, with the exception that he felt the front entrance doors to the hotel were still too heavy at the time of his resignation.[104]  DSMF ¶ 91; PRDSMF ¶ 92.

When questioned at deposition as to how AmeriPort retaliated against him, Mr. Burnett responded "by writing me up continuously when I had a proven medical condition."[105]  DSMF ¶ 98; PRDSMF ¶ 99.  When asked if there was any other way he felt retaliated against, Mr. Burnett responded, "By them not fully taking my disability into consideration, to doing just enough to get by."  DSMF ¶ 98; PRDSMF ¶ 99.  When asked who he felt had retaliated against him, Mr. Burnett responded, "I can't pick a person.  I wouldn't know who would do it.  There's too many people above me that I reported to and it didn't get taken care of.  That's all I know."  DSMF ¶ 98; PRDSMF ¶ 99.

### N.    Mr. Burnett's Resignation

On February 8, 2016, Mr. Burnett notified AmeriPort of his resignation effective February 26, 2016.[106]  DSMF ¶ 10; PRDSMF ¶ 10.  Since February 2016, Mr. Burnett has performed clerical work for FCi Federal.[107]  DSMF ¶ 92; PRDSMF ¶

---

[104]    Mr. Burnett denied this statement.  PRDSMF ¶ 92.  Because the statement accurately quotes Mr. Burnett's deposition testimony, and for the reasons discussed in footnote ninety-five, the Court rejects the denial and includes the statement, with some minor modifications to hew more closely to Mr. Burnett's testimony.

[105]    Mr. Burnett denied this statement.  PRDSMF ¶ 99.  Because the statement accurately quotes Mr. Burnett's deposition testimony, and for the reasons discussed in footnote ninety-five, the Court rejects the denial and includes the statement.

[106]    AmeriPort's original statement said "effective February 26, 2017."  DSMF ¶ 10.  Mr. Burnett denied, "Mr. Burnett gave his notice on February 8, 2016, effective February 26, 2016."  PRDSMF ¶ 10.  The Court corrects AmeriPort's apparent typographical error.

[107]    Mr. Burnett denied this statement, but the explanation appears to address the next paragraph.  PRDSMF ¶ 93.  The Court assumes that the denial was inadvertent.

93. At his deposition, Mr. Burnett estimated that he has been late to work on fifteen or sixteen occasions since beginning with FCi on February 9, 2016, despite being closer to work. DSMF ¶ 96; PRDSMF ¶ 97. At no time during Mr. Burnett's employment with AmeriPort was he ever demoted, nor did Mr. Burnett ever receive a reduction in pay. DSMF ¶ 97; PRDSMF ¶ 98.

Mr. Burnett applied for the FCi position in November of 2015 while still employed with AmeriPort, because, at least in part, he had moved to a new home in or around January 2014 and his commute to AmeriPort was an hour long.[108] DSMF ¶ 93; PRDSMF ¶¶ 93-94. Mr. Burnett testified that he needed a job that was closer to his new home and more convenient, and also stated that he wanted a more career-oriented and higher paying position.[109] DSMF ¶ 94; PRDSMF ¶ 95. Mr. Burnett testified that he resigned, in part, because he received a job offer from FCi Federal, and he would be unable to work both at AmeriPort and FCi Federal.[110] DSMF ¶ 95; PRDSMF ¶ 96. Mr. Burnett also submitted an affidavit claiming, "The reason I left my job was because I had been discriminated and retaliated against by OPL, and I

---

[108]   Mr. Burnett denied this statement. PRDSMF ¶¶ 93-94. Because the statement accurately states Mr. Burnett's deposition testimony, and for the reasons discussed in footnote ninety-five, the Court rejects the denial and includes the statement.

[109]   Mr. Burnett denied this statement. PRDSMF ¶¶ 95. Because the statement accurately states Mr. Burnett's deposition testimony, and for the reasons discussed in footnote ninety-five, the Court rejects the denial and includes the statement.

[110]   Mr. Burnett denied this statement. PRDSMF ¶¶ 96. Because the statement accurately states Mr. Burnett's deposition testimony, and for the reasons discussed in footnote ninety-five, the Court rejects the denial and includes the statement. Consistent with its duty to view contested facts in the light most favorable to Mr. Burnett at summary judgment, the Court also includes a statement from Mr. Burnett about his competing motivation for ending his employment with AmeriPort.

found an opportunity where I would be treated better." PRDSMF Attach 1 *Affidavit of Ryan Burnett* ¶ 19 (ECF No. 76).

### O.     AmeriPort's Policies and Preparation for Accessibility Issues

Ocean Properties maintains policies prohibiting and preventing discrimination based on disability.[111]  DSMF ¶ 2; PRDSMF ¶ 2.

Ms. Dawson does not recall anyone discussing that they should ask Mr. Burnett for a doctor's note to determine what limitations he had based on his obvious disability from being in a wheelchair.  PSAMF ¶ 25; DRPSAMF ¶ 25.  Ms. Dawson does not have any documents available to her in the form of policies, procedures, or training materials that discuss how to accommodate employees with disabilities.[112] PSAMF ¶ 26; DRPSAMF ¶ 26.  Ms. Dawson does not recall having any conversations with Ms. Darsaoui about any policies or documents concerning AmeriPort's obligations under the ADA.[113]  PSAMF ¶ 27; DRPSAMF ¶ 27.  Ms. Dawson has never attended a training on the ADA or reasonable accommodations, and PCFSI's HR

---

[111]    Mr. Burnett denied AmeriPort's original statement, which referred to AmeriPort, rather than Ocean Properties, PRDSMF ¶ 2, but the Court addresses the denial by adopting the assumption of an identity of interest between the Defendants, as Mr. Burnett asserts.  *See* footnote one.

[112]    AmeriPort offered a qualification to point out that Ms. Dawson testified that she deferred to Ms. Darsaoui on those matters, since Ms. Darsaoui was the human resources representative. DRPSAMF ¶ 26.  Since the qualification is not inconsistent with Mr. Burnett's statement, the Court rejects the qualification and includes the statement.

[113]    Mr. Burnett's original statement read, "Ms. Dawson does not recall having any conversations with Lori Darsaoui about AmeriPort's obligations to Ryan Burnett under the ADA."  PSAMF ¶ 27. AmeriPort offered a qualification, "Dawson only testified that she never had a conversation with Darsaoui regarding any policies or documents concerning AmeriPort's obligations under the ADA." DRPSAMF ¶ 27.  The Court resolves the qualification by modifying the statement to hew more closely to Ms. Dawson's deposition testimony, which does indeed address "information and documents," "something we can look at" and "manuals" rather than obligations to Mr. Burnett in general.

department does not provide instruction to the revenue management department of AmeriPort on issues related to the ADA.[114]  PSAMF ¶ 28; DRPSAMF ¶ 28.

Ms. Darasaoui never had a conversation with Mr. Burnett about what kind of limitations he had related to his inability to walk.[115]  PSAMF ¶ 45; DRPSAMF ¶ 45. Ms. Darsaoui does not have any information about who from AmeriPort was responsible for making the building ADA compliant.[116]  PSAMF ¶ 46; DRPSAMF ¶ 46.  Ms. Darsaoui agrees that it may have been uncomfortable for Mr. Burnett to raise accessibility issues with his employer every time they arose.[117]  PSAMF ¶ 15; DRPSAMF ¶ 15.

## III.   THE PARTIES' POSITIONS

### A.   Disability Discrimination – Disparate Treatment

#### 1.   AmeriPort and Ocean Properties' Motion

AmeriPort asserts that Mr. Burnett cannot make out a prima facie case because he never suffered an adverse employment action during his seven years of employment.  *Defs.' Mot.* at 22.  AmeriPort claims Mr. Burnett was never demoted,

---

[114]    AmeriPort offered a qualification to point out that Ms. Dawson was not a human resources employee, so her role as Vice President of Revenue Management generally limited her involvement with the ADA to pricing and selling ADA accommodated rooms to the general public.  DRPSAMF ¶ 28. Since the qualification is not inconsistent with Mr. Burnett's statement, the Court rejects the qualification and includes the statement.

[115]    AmeriPort offered a qualification, adding that while Ms. Darsaoui never specifically had a conversation as to his limitations, she was involved in several conversations about potential accommodations for his limitations.  DRPSAMF ¶ 45.  Since the qualification is not inconsistent with Mr. Burnett's statement, the Court rejects the qualification and includes the original statement.

[116]    AmeriPort offered a qualification to the original statement, which referred to making the building "ADA accessible," specifying that Ms. Darsaoui was unaware of who was responsible for dealing with ADA accessibility compliance issues.  The Court modifies the statement to refer to "ADA compliance" out of an abundance of caution.

[117]    AmeriPort offered a qualification to point out that she agreed it may have been uncomfortable for Mr. Burnett, but sought to clarify that she and Ms. Dawson did everything they could to accommodate Mr. Burnett.  DRPSAMF ¶ 15.  Since the qualification is not inconsistent with Mr. Burnett's statement, the Court includes it and rejects the qualification.

never had his pay reduced, and was never subject to an unfavorable transfer. *Id.*

AmeriPort argues that mere criticism, counseling, or corrective actions do not

constitute adverse action. *Id.* at 22-23.

AmeriPort also insists that it did not constructively discharge Mr. Burnett. *Id.*

at 23. AmeriPort suggests that the incidents Mr. Burnett cites do not rise to the level

of onerous or abusive, as required for constructive termination. *Id.* AmeriPort cites

Mr. Burnett's testimony that he was attracted to the shorter commute and better pay

of a different job. *Id.* at 24.

AmeriPort also disputes whether Mr. Burnett has presented any evidence on

the fourth element of his prima facie case, that he was treated less favorably than

non-disabled employees. *Id.* at 24-25.

### 2. Mr. Burnett's Response

Mr. Burnett begins by citing the ADA Amendments Act of 2008, which sought

to refocus the inquiry on whether discrimination has occurred, not whether the

individual meets the definition of a disability. *Pl.'s Opp'n* at 9-10 ("This distinction

between the original ADA and the ADAAA is significant because the vast majority of

precedent cited by Defendants in favor of summary judgment predate the 2008

Amendments"). Mr. Burnett also points to the 2010 Standards for Accessible Design,

implying that AmeriPort's facilities did not bring their facilities up to those standards

and "Defendants' failure to do so for Mr. Burnett raises a strong inference of

discriminatory animus." *Id.* at 10-11.

### 3. AmeriPort and Ocean Properties' Reply

AmeriPort accuses Mr. Burnett of conflating accessibility standards for the public under Title III of the ADA with requirements for employees under Title I. *Defs.' Reply* at 12-13. AmeriPort suggests that Mr. Burnett's theory that "any potential violation of Title III necessarily results in a Title I failure to accommodate . . . would lead to an absurd result" because it "would provide monetary relief to employees who merely raised technical violations under Title III where injunctive relief is the only remedy." *Id.* at 13.

### B. Disability Discrimination – Failure to Accommodate

### 1. AmeriPort and Ocean Properties' Motion

AmeriPort argues that Mr. Burnett was not a qualified individual under the ADA because he demonstrated that he could not perform all of the essential functions of the job. *Defs.' Mot.* at 14. AmeriPort claims that "employers are permitted to treat regular attendance as an essential job requirement and need not accommodate erratic or unreliable attendance." *Id.* AmeriPort points to Mr. Burnett's five corrective actions during the course of his employment "due to his chronic tardiness and absenteeism." *Id.* at 15.

AmeriPort also maintains that it repeatedly engaged in the interactive process and provided all reasonable accommodations. *Id.* at 16-21. AmeriPort contends that employers are not to be punished for inevitable isolated breakdowns or temporary inconveniences, which it asserts is all that happened here. *Id.* at 16-17.

### 2. Mr. Burnett's Response

Mr. Burnett responds that he was a qualified individual because it is a question of fact whether regular, predictable attendance was an essential function of the job. *Pl.'s Opp'n* at 14. He maintains that tardiness and absences were common occurrences, and that shifts were staggered to account for varying attendance and high turnover. *Id.* Mr. Burnett also claims that AmeriPort essentially argues that he was not qualified because his disability caused attendance issues, which Mr. Burnett claims "suggests a violation of the Family Medical Leave Act." *Id.* at 15. Mr. Burnett asserts that AmeriPort maintained a "'no fault' attendance/call out policy" in violation of the FMLA. *Id.*

Mr. Burnett contends that AmeriPort failed to engage in the interactive process, which requires a great deal of communication between the employer and the employee. *Id.* at 16. Mr. Burnett points out that unreasonable delay or obstructing the interactive process can amount to a failure to accommodate. *Id.* at 17.

### 3. AmeriPort and Ocean Properties' Reply

AmeriPort insists that it provided Mr. Burnett numerous accommodations during his employment. *Defs.' Reply* at 1-2; 5-9. It also claims it repeatedly engaged in the interactive process in good faith. *Id.* at 9-10. In support of its argument that Mr. Burnett was not a qualified individual because he could not meet the essential requirements of the job, AmeriPort points to portions of Mr. Burnett's testimony in which he acknowledged the importance of arriving to work on time, and AmeriPort's offer to allow Mr. Burnett to work a different shift. *Id.* at 3-5.

AmeriPort also submits that Mr. Burnett's attempt to raise FMLA issues are unsupported but also precluded since he did not raise them in any prior pleading or discovery. *Id.* at 12.

## C.  Retaliation

### 1.  AmeriPort and Ocean Properties' Motion

AmeriPort concedes that Mr. Burnett engaged in protected conduct by requesting accommodations and filing his Charge. *Defs.' Mot.* at 26. AmeriPort maintains, however, that Mr. Burnett did not suffer any adverse employment action, and thus was not retaliated against for that protected conduct. *Id.* at 26-29.

### 2.  Mr. Burnett's Response

Mr. Burnett highlights the context-specific nature of the adverse action inquiry, and suggests that threats of discharge "which occurred in every one of Mr. Burnett's corrective actions, can be considered adverse action . . . ." *Pl.'s Opp'n* at 18. Mr. Burnett insists that AmeriPort "unfairly disciplined" him for absences that should not have been held against him, which rose "to the level of unfair discriminatory discipline, with threat of discharge . . . ." *Id.* at 18-19. Similarly, Mr. Burnett argues that his constructive discharge argument establishes adverse action and is sufficient to survive summary judgment. *Id.* at 19-20.

### 3.  AmeriPort and Ocean Properties' Reply

AmeriPort reiterates that "mere corrective actions not accompanied by any reduction in responsibilities or pay do not constitute adverse employment actions." *Defs. Reply* at 10. AmeriPort also maintains that neither corrective actions nor

alleged failures to accommodate rose to the level of a constructive discharge, and that

Mr. Burnett left willingly for a better job. *Id.* at 11.

## IV.  LEGAL STANDARD

Summary judgment is appropriate "if the movant shows that there is no

genuine dispute as to any material fact and the movant is entitled to judgment as a

matter of law." FED. R. CIV. P. 56(a).  A fact is "material" if it "has the potential to

change the outcome of the suit." *Tropigas de Puerto Rico, Inc. v. Certain Underwriters

at Lloyd's of London*, 637 F.3d 53, 56 (1st Cir. 2011) (quoting *Borges ex rel. S.M.B.W.

v. Serrano-Isern*, 605 F.3d 1, 5 (1st Cir. 2010)).  A dispute is "genuine" if "a reasonable

jury could resolve the point in favor of the nonmoving party." *Id.* (quoting *McCarthy

v. Nw. Airlines, Inc.*, 56 F.3d 313, 315 (1st Cir. 1995)).

Once this evidence is supplied by the moving party, the nonmovant must

"produce 'specific facts, in suitable evidentiary form, to . . . establish the presence of

a trialworthy issue.'" *Triangle Trading Co., Inc. v. Robroy Indus., Inc.*, 200 F.3d 1, 2

(1st Cir. 1999) (quoting *Morris v. Gov't Dev. Bank of Puerto Rico*, 27 F.3d 746, 748

(1st Cir. 1994)).  In other words, the non-moving party must "present 'enough

competent evidence' to enable a factfinder to decide in its favor on the disputed

claims." *Carroll v. Xerox Corp.*, 294 F.3d 231, 237 (1st Cir. 2002) (quoting *Goldman

v. First Nat'l Bank of Boston*, 985 F.2d 1113, 1116 (1st Cir. 1993)).  The Court then

"views the facts and draws all reasonable inferences in favor of the nonmoving

party." *Ophthalmic Surgeons, Ltd. v. Paychex, Inc.*, 632 F.3d 31, 35 (1st Cir. 2011).

However, the Court "afford[s] no evidentiary weight to 'conclusory allegations, empty

rhetoric, unsupported speculation, or evidence which, in the aggregate, is less than

significantly probative.'" *Tropigas*, 637 F.3d at 56 (quoting *Rogan v. City of Boston*, 267 F.3d 24, 27 (1st Cir. 2001)); *accord Sutliffe v. Epping Sch. Dist.*, 584 F.3d 314, 325 (1st Cir. 2009).

## V.     DISCUSSION

### A.     Time Limitations and Exhaustion of Administrative Remedies

"Claims . . . under the ADA are subject to the same remedies and procedures as those under Title VII of the Civil Rights Act of 1964." *Farris v. Shinseki*, 660 F.3d 557, 562 (1st Cir. 2011) (citing 42 U.S.C. §§ 2000e *et seq.*; 42 U.S.C. § 12117(a)). Employees alleging disability discrimination or retaliation "must file an administrative claim with the EEOC or with a parallel state agency before a civil action may be brought." *Thornton v. United Parcel Serv., Inc.*, 587 F.3d 27, 31 (1st Cir. 2009). "When filed with a state agency, the administrative [charge] must be filed within 300 days after the alleged unlawful employment practice occurred." *Id.* at 31 (citing 42 U.S.C. § 2000e-5(e)(1); *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 109 (2002). Maine antidiscrimination and whistleblower protections laws contain the same administrative exhaustion requirement and 300-day time limitation. 5 MRS §§ 4611, 4622. The pro se Charge is construed liberally. *See e.g. Deppe v. United Airlines*, 217 F.3d 1262, 1267 (9th Cir. 2000).

The Supreme Court explained:

[D]iscrete discriminatory acts are not actionable if time barred, even when they are related to acts alleged in timely filed charges. Each discrete discriminatory act starts a new clock for filing charges alleging that act. The charge, therefore, must be filed within the . . . 300–day time period after the discrete discriminatory act occurred. The existence of past acts and the employee's prior knowledge of their occurrence, however, does not bar employees from filing charges about related

discrete acts so long as the acts are independently discriminatory and charges addressing those acts are themselves timely filed. Nor does the statute bar an employee from using the prior acts as background evidence in support of a timely claim.

*Morgan*, 536 U.S. at 113. There are a few exceptions to this "discrete" acts approach, however.

First, constructive termination claims, based on a hostile environment, "are different in kind from discrete acts. Their very nature involves repeated conduct." *Id.* at 115. "Provided that an act contributing to the claim occurs within the filing period, the entire time period of the hostile environment may be considered by a court for the purposes of determining liability." *Id.* at 117.

Second, under the "scope of the investigation rule," "the exact wording of the charge . . . need not presage with literary exactitude the judicial pleadings which may follow," so a district court may "look beyond the four corners of the underlying administrative charge to consider collateral and alternative bases or acts that would have been uncovered in a reasonable investigation." *Thornton*, 587 F.3d at 32 (quoting *Davis v. Lucent Technologies, Inc.*, 251 F.3d 227, 233 (1st Cir. 2001). The rule does not, however, provide a plaintiff with an unlimited license to extend his claim endlessly beyond the bounds and parameters encompassed by the administrative charge. *Id.*

Third, "[a] claim of retaliation for filing an administrative charge . . . is one of the narrow exceptions to the normal rule of exhaustion of administrative remedies. Such a claim may ordinarily be bootstrapped onto the other . . . claims arising out of

the administrative charge and considered by the district court . . . ." *Franceschi v. U.S. Dep't of Veterans Affairs*, 514 F.3d 81, 86 (1st Cir. 2008).

Accordingly, in assessing the merits of Mr. Burnett's claims, the Court considers (1) those discrete acts contained in the charge which occurred between September 2, 2014 and June 29, 2015, (2) other discrete acts within that time period that would have been uncovered in a reasonable investigation, (3) any discrete retaliatory acts resulting from Mr. Burnett filing his charge, and (4) all of the conditions and aspects of the environment of Mr. Burnett's entire employment period for purposes of his constructive termination argument.

## B.     Disability Discrimination

Title I of the ADA prohibits discrimination "against a qualified individual on the basis of disability in regard to . . . the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment."   42 U.S.C. § 12112(a); *see Richardson v. Friendly Ice Cream Corp.*, 594 F.3d 69, 75 (1st Cir. 2010).

### 1.     Disparate Treatment

Absent direct evidence of discrimination, courts are directed to use the familiar burden-shifting paradigm outlined by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), in evaluating disability discrimination claims under the ADA.  *See Higgins v. New Balance Athletic Shoe, Inc.*, 194 F.3d 252, 264 (1st Cir. 1999).  "To establish a prima facie case of disability discrimination under the ADA, a plaintiff must prove: (1) that she 'was disabled' within the meaning of the ADA; (2) that she was able to perform the essential functions of her job with or

without accommodation; and (3) that she was discharged or adversely affected, in whole or in part, because of her disability." *Ruiz Rivera v. Pfizer Pharms., LLC*, 521 F.3d 76, 82 (1st Cir. 2008); s*ee also Orta–Castro v. Merck, Sharp & Dohme Quimica P.R., Inc.*, 447 F.3d 105, 111 (1st Cir. 2006). If the plaintiff establishes a prima facie case, an inference of intentional discrimination is raised, and the burden of production shifts to the defendant to articulate a legitimate, non-discriminatory reason for its employment decision. *McDonnell Douglas*, 411 U.S. at 802; *Ingram v. Brink's, Inc.*, 414 F.3d 222, 230 (1st Cir.2005). Finally, if the defendant does so, the burden of production shifts back to the plaintiff, and the plaintiff must proffer evidence to establish that the defendant's non-discriminatory justification is mere pretext, cloaking discriminatory animus. *McDonnell Douglas*, 411 U.S. at 804; *Ingram*, 414 F.3d at 230. Should the plaintiff fail "to make it past the first stage, i.e., to aver a prima facie case, the inference of discrimination simply never arises and the employer's motion for summary judgment is granted." *Ingram*, 414 F.3d at 230.

There is no dispute that Mr. Burnett satisfies the first element, so the Court turns to the other elements of Mr. Burnett's prima facie case.

### a. On this record, the Court cannot conclude that Mr. Burnett was not a qualified individual.

Mr. Burnett bears the burden of proving that he is a "qualified individual," which means "an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8). "The analysis is generally broken into two steps: (1) whether the employee could perform the essential functions

of the job; and (2) if not, whether any reasonable accommodation by the employer would enable him to perform those functions." *Ward v. Massachusetts Health Research Institute, Inc.*, 209 F.3d 29, 33 (1st Cir. 2000) (citing *White v. York Int'l Corp.*, 45 F.3d 357, 361 (10th Cir. 1995)).  When the essential functions of the job are contested, however, "it is difficult to separate the analysis in this manner." *Ward*, 209 F.3d at 34.

Although Mr. Burnett has the burden of showing that he is capable of performing the essential functions of a reservation agent, AmeriPort "bear[s] the burden of proving that a given job function is an essential function." *Ward*, 209 F.3d at 35 (justifying the burden by arguing that the employer "has better access to the relevant evidence" to prove essential job functions).  An essential function is a "fundamental job duty of the position at issue," which "does not include marginal tasks."  29 C.F.R. § 1630.2(n)(1); *Jones v. Nationwide Life Ins. Co.*, 696 F.3d 78, 88 (1st Cir. 2012) (quoting *Kvorjak v. Maine*, 259 F.3d 48, 55 (1st Cir. 2001)) (internal quotations omitted).  Evidence of whether a particular function is essential includes, but is not limited to: "the employer's judgment, written job descriptions, the work experience of past incumbents of the job, and the current work experience of incumbents in similar jobs." *Mulloy v. Acushnet Co.*, 460 F.3d 141, 147 (1st Cir. 2006) (citing 29 C.F.R. § 1630.2(n)(3)).

A court must give a "significant degree" of deference to an employer's business judgment about the necessities of a job. *Jones*, 696 F.3d at 88.  The First Circuit has made "equally clear, however, that the employer's good-faith view of what a job

entails, though important, is not dispositive." *Id.* (quoting *Gillen v. Fallon Ambulance Servs., Inc.*, 283 F.3d 11, 25 (1st Cir. 2002)). "In the final analysis, the complex question of what constitutes an essential job function involves fact-sensitive considerations and must be determined on a case-by-case basis." *Gillen*, 283 F.3d at 25.

AmeriPort argues that Mr. Burnett could not perform all of the essential functions of his job, relying on the First Circuit's teaching that "attendance is an essential function of any job." *Colon-Fontanez v. Municipality of San Juan*, 660 F.3d 17, 33 (1st Cir. 2011) (quoting *Rios-Jimenez v. Principi*, 520 F.3d 31, 42 (1st Cir. 2008)). The problem with AmeriPort's argument is that Mr. Burnett did not have an attendance problem so much as a tardiness problem. The Court does not view these as presenting exactly the same obstacle to job performance. Except in circumstances not present here, an employee must come to work in order to work. But whether there is latitude in precisely when the employee arrives is a different matter. While many jobs undoubtedly require consistently prompt arrivals, a reasonable jury could find that it was not essential for AmeriPort's call center reservations agents because it used staggered shifts and the number of workers present at each shift often varied. The record also indicates that Mr. Burnett generally received positive performance reviews, indicating that he was capable of performing his essential job duties despite his pattern of tardiness captured in the corrective actions.

Accordingly, the Court finds that Mr. Burnett has met his burden on the second element of his prima facie case.

### b. Mr. Burnett did not sustain an adverse employment action.

### i. Discrete Actions

"Determining whether an action is materially adverse necessarily requires a case-by-case inquiry." *Blackie v. State of Me.*, 75 F.3d 716, 725 (1st Cir. 1996).

> Typically, the employer must either (1) take something of consequence from the employee, say, by discharging or demoting her, reducing her salary, or divesting her of significant responsibilities, or (2) withhold from the employee an accouterment of the employment relationship, say, by failing to follow a customary practice of considering her for promotion after a particular period of service.

*Id.* at 725-26 (internal citations omitted); *see also Noviello v. City of Boston*, 398 F.3d 76, 88 (1st Cir. 2005); *White v. New Hampshire Dep't of Corr.*, 221 F.3d 254, 262 (1st Cir. 2000) ("Adverse employment actions include 'demotions, disadvantageous transfers or assignments, refusals to promote, unwarranted negative job evaluations, and toleration of harassment by other employees'") (quoting *Hernandez–Torres v. Intercontinental Trading, Inc.*, 158 F.3d 43, 47 (1st Cir. 1998)).

Here, AmeriPort never terminated or demoted Mr. Burnett, nor decreased his hourly wage. There is no suggestion he was overlooked for advancement. Furthermore, many of the discrete actions which Mr. Burnett raises are time barred because they occurred long before the 300-day limit, such as the illegally parked guest at the rear entrance, the incident with the maintenance employee, or the time Mr. Burnett was told to move his truck from under the front canopy.

Neither do the corrective actions constitute "unwarranted negative job evaluations" that could rise to the level of an adverse employment action. It is true that many employees find it frustrating to be "written up," particularly if they believe

that it resulted from events beyond their control.  But, apart from the write-up itself, there is no evidence in the record that any negative consequences flowed from these corrective actions.  The only evidence in the record indicates that AmeriPort disciplined or warned Mr. Burnett in an attempt to reduce his tardiness, a conclusion bolstered by AmeriPort's offer to adjust his schedule so that Mr. Burnett could improve his punctuality.  Even assuming that some of those instances of tardiness included in the corrective actions were disability-related, that does not make the corrective actions adverse employment actions.  Mr. Burnett suggests that each corrective action carried the "threat of discharge," but that never occurred and there is no other indication in the record that the corrective actions resulted in other material negative consequences, like reduced pay or missed opportunities.

The question about time spent in the bathroom from one of Mr. Burnett's supervisors during an annual performance review did not constitute an adverse action either.  Nor is it direct evidence of discriminatory animus.  Even according to Mr. Burnett's description of the incident, it was brief, occurred in private, was free of mockery or intentional insult, and was never raised again.  It was understandable that Mr. Burnett found this question awkward or embarrassing, particularly if the supervisor was not sensitive in her delivery.  But the evidence in the record here confirms that Mr. Burnett's supervisor merely asked whether he needed additional time in the bathroom due to his disability and when he responded affirmatively, the supervisor made no further inquiry.  Furthermore, there is no evidence that the employer sanctioned Mr. Burnett as a result of additional time in the bathroom.

From the Court's perspective, it cannot be inappropriate for an employer merely to ask an employee whether an aspect of the employee's performance is related to a disability so long as the employer does not hold an affirmative response against the employee. If an employee does not affirmatively inform the employer, the Court is unclear how an employer is to know, unless the employer asks the question.

Mr. Burnett has not produced any cases finding an adverse employment action in similar circumstances. While the Court accepts that many of the incidents were uncomfortable for Mr. Burnett, it cannot conclude that a reasonable jury could find that any of them constituted an adverse employment action.

### ii.    Constructive Discharge

Alleging constructive discharge presents a "special wrinkle" that amounts to an additional prima facie element in an employment discrimination case. *Landrau-Romero v. Banco Popular de Puerto Rico*, 212 F.3d 607, 613 (1st Cir. 2000) (citation omitted). A plaintiff who seeks to withstand summary judgment on a claim of constructive discharge must point to evidence in the record showing that, as a result of discrimination, her "working conditions were so difficult or unpleasant that a reasonable person in her shoes would have felt compelled to resign." *Ahern v. Shinseki*, 629 F.3d 49, 59 (1st Cir. 2010) (quoting *Marrero v. Goya of Puerto Rico, Inc.*, 304 F.3d 7, 28 (1st Cir. 2002)). The standard is objective—it cannot be triggered solely by the employee's subjective beliefs, no matter how sincerely held. *Marrero*, 304 F.3d at 28. Constructive discharge cases typically arise from hostile work environments. *See, e.g., Alvarado*, 687 F.3d at 461-62; *Ahern*, 629 F.3d at 59; *Marrero*, 304 F.3d at 14–15. "[I]n order for a resignation to constitute a constructive

discharge, it effectively must be void of choice or free will." *Torrech–Hernandez v. Gen. Elec.*, 519 F.3d 41, 50 (1st Cir. 2008).

Although constructive discharge is usually a fact-intensive inquiry, *Willingham v. Town of Stonington*, 847 F. Supp. 2d 164, 191 (D. Me. 2012) (citing *Stremple v. Nicholson*, 289 F. App'x. 571, 574 (3d Cir. 2009)), even viewing the evidence in the light most favorable to Mr. Burnett, the Court is unable to conclude that a reasonable jury could find that his working conditions were so difficult or unpleasant that a reasonable person in his shoes would have felt compelled to resign. This is true even considering all of the incidents over the nearly seven years he was employed at AmeriPort. Mr. Burnett's own statements about his motivations counter a finding of constructive discharge, which is confirmed by the fact that his work environment in the FIT department for the last seven months before his resignation was without incident or complaint.

The Court is sympathetic to the obstacles Mr. Burnett faced, but none of AmeriPort's actions individually or collectively rose above the "ordinary, if occasionally unpleasant, vicissitudes of the workplace" and "commonplace indignities" that are to be distinguished from hostile environments that result in constructive termination. *See Noviello*, 398 F.3d at 92. Accordingly, the Court concludes that AmeriPort is entitled to summary judgment on the disparate treatment issue.

### 2.    Failure to Accommodate

Under the ADA, the term "discriminate" also includes "not making reasonable accommodations to the known physical or mental limitations of an otherwise

qualified individual with a disability . . . unless the accommodation would impose an undue hardship on the operation of the business." *Id.* § 12112(b)(5)(A); *see Higgins*, 194 F.3d at 264. The *McDonnell Douglas* model does not apply because intentional discrimination is not required to prove a failure to accommodate. *Higgins*, 194 F.3d at 264 (stating that "[i]t follows inexorably that the *McDonnell Douglas* scheme is inapposite in respect to such claims").

An accommodation "enable[s] an individual with a disability who is qualified to perform the essential functions of that position . . . [or] to enjoy equal benefits and privileges of employment." 29 C.F.R. § 1630.2(o)(1)(ii), (iii). A plaintiff in a failure to accommodate case has the burden of proving the following elements: (1) that the individual was disabled within the meaning of the ADA; (2) that the individual was qualified to perform the essential functions of his job with or without a reasonable accommodation; and (3) that the employer knew of the disability and did not reasonably accommodate it. *Freadman v. Metro. Prop. & Cas. Ins. Co.*, 484 F.3d 91, 102 (1st Cir. 2007); *Carroll v. Xerox Corp.*, 294 F.3d 231, 237 (1st Cir. 2002) (citing *Higgins*, 194 F.3d at 264); *see also Jones v. Nationwide Life Ins. Co.*, 696 F.3d 78, 86-89 (1st Cir. 2012).

There is no dispute that Mr. Burnett satisfies the first element. For the reasons described in subpart B-1-a above, Mr. Burnett carried his burden for summary judgment purposes on the second element. The Court, therefore, addresses the third element in more detail.

### a. AmeriPort reasonably accommodated Mr. Burnett after many of the incidents he raises.

"In order to prove 'reasonable accommodation,' a plaintiff needs to show not only that the proposed accommodation would enable her to perform the essential functions of her job, but also that, at least on the face of things, it is feasible for the employer under the circumstances." *Reed v. LePage Bakeries, Inc.*, 244 F.3d 254, 259 (1st Cir. 2001). "If [the] plaintiff succeeds in carrying this burden, the defendant then has the opportunity to show that the proposed accommodation is not as feasible as it appears but rather that there are further costs to be considered, certain devils in the details." *Id.*

Mr. Burnett and AmeriPort repeatedly engaged in the interactive process throughout Mr. Burnett's employment. When Mr. Burnett sought wheelchair accessible entry to the rear of the building, AmeriPort provided a key card for him to access the rear guest door with the handicapped accessible ramp. When this accommodation proved less than ideal after the keycard often failed to work properly and there was damage to the door, AmeriPort provided Mr. Burnett's preferred accommodation by leaving that door unlocked. After Mr. Burnett's access was limited one morning following a snowstorm, AmeriPort provided an accommodation by allowing him to park under the front lobby canopy in the event of future problems accessing the rear door. After the move to the new golf club location, when Mr. Burnett reminded AmeriPort that he could not use the bathroom, AmeriPort quickly altered the bathroom, and Mr. Burnett told them it would meet his needs. The Court also notes that these requests and accommodations occurred well before the 300-day

window preceding Mr. Burnett's Charge and, therefore, would be time barred even if AmeriPort's conduct constituted a denial of a reasonable accommodation. *See Thornton,* 587 F.3d at 33 ("Mr. Thornton did not file timely charges related to any alleged act of discrimination other than the single act identified in his 2001 MCAD charge. His civil action, therefore, cannot reach these additional acts").

Regarding the unexpected elevator malfunction, Mr. Burnett failed to meet his burden of showing that AmeriPort did not reasonably accommodate his disability, even viewing the facts in the light most favorable to him at summary judgment. That was a brief interruption in access, and there is no indication in this record that AmeriPort could have completely avoided all such interruptions. Mr. Burnett does not cite any authority that AmeriPort was obligated to pay Mr. Burnett for the shift he missed, but AmeriPort paid Mr. Burnett for the time the elevator was not working, which amounted to half of the missed shift. After Mr. Burnett filed his Charge, AmeriPort paid him for missed hours which covered more than the remaining two and one-half hours he sought for the elevator malfunction.

During the scheduled repairs, AmeriPort made a temporary workspace so that Mr. Burnett could continue working. Although he could not access the usual workspace on the upper floor, this was temporary and there is no suggestion in the record that the repairs were unreasonably delayed. The ADA public accommodation standards are helpful:

> While federal regulations implementing the ADA require public entities to "maintain in operable working condition those features of facilities and equipment that are required to be readily accessible to and usable by persons with disabilities," 28 C.F.R. § 35.133(a), this requirement

"does not prohibit isolated or temporary interruptions in service or access due to maintenance or repairs," 28 C.F.R. § 35.133(b); *see also Forestier Fradera [v. Municipality of Mayaguez]*, 440 F.3d [17][,] 22 (1st Cir. 2006) (finding no liability under the ADA for delay in installation of elevator due to "the inevitable complications arising from a major, publicly funded construction project on a historic building"). In such cases, a public entity may fulfill its obligation to persons with disabilities "through such means as . . . delivery of services at alternate accessible sites . . . or any other methods that result in making its services . . . readily accessible to and usable by individuals with disabilities." 28 C.F.R. § 35.150(b)(1). The record confirms that this is precisely what Defendants did.

*Partelow v. Massachusetts*, 442 F. Supp. 2d 41, 48-49 (D. Mass. 2006). The Court is persuaded that Mr. Burnett's interpretation of "failing" to accommodate goes too far because:

Isolated or temporary interruptions in access due to maintenance and repair of accessible features are not prohibited . . . Mechanical failures in equipment such as elevators or automatic doors will occur from time to time. The obligation to ensure that facilities are readily accessible to and usable by individuals with disabilities would be violated, if repairs are not made promptly or if improper or inadequate maintenance causes repeated and persistent failures.

*Thill v. Olmsted Cty.*, No. 08-CV-4612 PJS/JSM, 2010 U.S. Dist. LEXIS 87215, at *17-18, 2010 WL 3385234, at *6 (D. Minn. Aug. 24, 2010) (quoting U.S. Dep't of Justice, *The Americans with Disabilities Act: Title II Technical Assistance Manual* (1993))

The Court understands Mr. Burnett was not entirely satisfied with his temporary workspace because he did not have uninterrupted access to a drinking fountain or a microwave and felt segregated from the other employees. While these frustrations are entirely understandable, limited access to a drinking fountain and the lack of a microwave, for which he never asked, simply do not render AmeriPort's

accommodation unreasonable. "The ADA provides a right to reasonable accommodation, not to the employee's preferred accommodation." *E.E.O.C. v. Agro Distribution, LLC*, 555 F.3d 462, 471 (5th Cir. 2009); (citing *Hedrick v. Western Reserve Care System*, 355 F.3d 444, 457 (6th Cir.2004)); ; *E.E.O.C. v. UPS Supply Chain Sols.*, 620 F.3d 1103, 1110 (9th Cir. 2010); *Emerson v. N. States Power Co.*, 256 F.3d 506, 515 (7th Cir. 2001).

According to Mr. Burnett, AmeriPort provided a temporary workspace, including a makeshift break room, altered the desk when he told them it was not satisfactory, and adjusted the schedule to prevent the employees from getting in each other's way. No reasonable jury could find this temporary situation during elevator maintenance to constitute a failure to accommodate Mr. Burnett's disability. Regarding his second frustration, that he felt segregated from other employees, Mr. Burnett has not met his burden of putting forth a reasonable accommodation that would have addressed the segregation issue during the elevator repair.

> **b.** **There is a genuine dispute of material fact concerning Mr. Burnett's request for an accommodation to make the heavy wooden doors more accessible.**

The remaining incident is Mr. Burnett's request for push-button access to the heavy wooden doors at the golf club location. Adopting a view of the facts most favorable to Mr. Burnett, he made plain, direct requests for an accommodation, and while employees at AmeriPort looked into the situation, they did not respond to him directly and did not alter the doors until much later, after Mr. Burnett resigned. Mr. Burnett has met his burden at this stage of showing that the requested

accommodation was reasonable, and AmeriPort has not shown that it would have represented an undue hardship, especially as AmeriPort eventually made the alteration.

This accommodation might not have been needed for Mr. Burnett to perform the essential functions of his position and enjoy equal benefits and privileges of employment. Many cases teach that all requests are not "reasonable" or are not "accommodations" within the meaning of the ADA when they are not needed, given the other circumstances and the other accommodations the employer has provided.

> [I]n a case such as this, in which the employer has already taken (or offered) measures to accommodate the disability, the employer is entitled to summary judgment if, on the undisputed record, the existing accommodation is 'plainly reasonable.' . . . [E]mployers are not required to provide a perfect accommodation or the very accommodation most strongly preferred by the employee. . . . All that is required is effectiveness.

*Noll v. Int'l Bus. Machines Corp.*, 787 F.3d 89, 95 (2d Cir. 2015); *Griffin v. United Parcel Serv., Inc.*, 661 F.3d 216, 225 (5th Cir. 2011) ("None of the information Griffin provided UPS indicated that his requested accommodation was necessary for the management of his diabetes"); *Rauen v. U.S. Tobacco Mfg. Ltd. P'ship*, 319 F.3d 891, 897 (7th Cir. 2003) ("[W]e do not answer the question today of whether any accommodation could ever be reasonable for an employee who can perform all essential job functions without accommodation. But Rauen's ability to perform the essential functions of the job without accommodation surely weighs against the reasonableness of an accommodation"); *Black v. Wayne Ctr.*, 225 F.3d 658 (6th Cir. 2000) ("[W]e think that where plaintiff is able to perform the job without accommodation, plaintiff cannot demonstrate the objective reasonableness of any

desired accommodation"); *Fink v. New York City Dep"t of Personnel*, 53 F.3d 565, 567 (2d Cir. 1995) ("It does not require the perfect elimination of all disadvantage that may flow from the disability; it does not require a lowering of standards. . . . It does not require the employer to provide every accommodation the disabled employee may request, so long as the accommodation provided is reasonable"[118]).

The Court cannot say, on this record at summary judgment, that Mr. Burnett plainly enjoyed equal benefits and privileges of employment during the time he worked in the golf club location without any modification to the doors because there is evidence that it was difficult for Mr. Burnett to enter and exit the workplace. Depending on how heavy the lobby doors were, it might have been quite difficult to operate for someone in a wheelchair or it might have been only a minor inconvenience that did not sufficiently interfere with Mr. Burnett's ability to access his workplace as to require AmeriPort to install an automatic opener. For purposes of summary judgment, the Court adopts the former conclusion. Whether an automatic push-button mechanism for those doors represented a reasonable accommodation is best resolved by a fact-finder.

The timing of Mr. Burnett's request for an accommodation related to the wooden doors presents an additional wrinkle. When an employer explicitly refuses a request for an accommodation, the refusal represents a discrete act triggering the

---

[118] This quote referred to the Section 504 of the Rehabilitation Act, but "unless one of those subtle distinctions is pertinent to a particular case, [courts] treat claims under the two statutes identically." *Henrietta D. v. Bloomberg*, 331 F.3d 261, 272 (2d Cir. 2003); *Parker v. Universidad de Puerto Rico*, 225 F.3d 1, 4 (1st Cir. 2000) ("In applying Title II, therefore, we rely interchangeably on decisional law applying § 504").

statutory limitations period. *Tobin v. Liberty Mut. Ins. Co.*, 553 F.3d 121, 129 (1st Cir. 2009). Even without an explicit denial, "unreasonable delay may amount to a failure to provide reasonable accommodations." *Valle-Arce v. Puerto Rico Ports Auth.*, 651 F.3d 190, 200 (1st Cir. 2011). When there is no explicit denial, for purposes of the 300-day time limit, the refusal occurs or accrues when the employee "knew or reasonably should have been aware that the employer was unlikely to afford him [or her] a reasonable accommodation." *Tobin v. Liberty Mut. Ins. Co.*, 553 F.3d 121, 133 n.10 (1st Cir. 2009) (quoting *Ocean Spray Cranberries, Inc. v. Massachusetts Comm'n Against Discrimination*, 808 N.E.2d 257, 268 (Mass. 2004)).

Mr. Burnett first addressed the wooden doors as one of several requests in his December 24, 2013 email, which preceded the 300-day time window that started on September 2, 2014. Mr. Burnett did not receive a response, and AmeriPort did not alter the doors until after he resigned. Mr. Burnett raised the issue again on August 28, 2014, and Mr. Burnett discussed the heavy wooden doors in his Charge on June 29, 2015. AmeriPort's non-response to Mr. Burnett's first request is, therefore, time barred. But the failure to respond to the second request is an independent discrete act which occurred within the 300-day window because there is no evidence that Mr. Burnett knew or reasonably should have known that AmeriPort was unlikely to grant the request within the five days that elapsed between the date of his second request and the start of the 300-day window.

Finally, the Court notes that, even if AmeriPort were required to grant Mr. Burnett's request, whether he sustained any damages from its failure to do so is a

close issue. Compensatory damages are available for violations of the ADA, which contemplates and caps damages for "emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other non-pecuniary losses." 42 U.S.C. § 1981a(a)(2), (b)(3); *Hogan v. Bangor & Aroostook R. Co.*, 61 F.3d 1034, 1037-38 (1st Cir. 1995); *see also* 5 M.R.S. § 4613(2)(B)(8)(e) ("emotional pain, suffering, inconvenience, mental anguish . . ."). But the discrimination statutes do not "provide statutory authority for automatic or presumptive damages." *Azimi v. Jordan's Meats, Inc.*, 456 F.3d 228, 234 (1st Cir. 2006). "The availability of noneconomic damages . . . does not mean that their recovery is automatic whenever a plaintiff prevails." *Id.* (quoting Lindemann & Grossman, 2 *Employment Discrimination Law* 1828 (3d ed.1996)). "An award of damages for emotional distress must be supported by competent evidence of genuine injury, the proof of which is distinct from the proof required to show discrimination . . . ." *Id.* (internal citations and quotation marks omitted).

Most of Mr. Burnett's testimony regarding damages is consistent with a vague sense of frustration and feeling brushed off. *Burnett Dep.* at 88:11-89-19. According to Mr. Burnett, the incidents over the course of his employment caused him stress and occasionally would cause difficulty getting to sleep. *Id.* The specific incidents when he would be "tossing and turning," were "the elevator issue . . . and the snow on New Year's." *Id.* at 89:20-25, 90:24-91:2. Regarding the wooden doors, Mr. Burnett said, "[AmeriPort] could have been more communicating with me to tell me that the doors were being looked into and were cleared. They could have been more

up front with me on things." *Id.* at 154:20-23. Regarding the wooden doors more specifically, Mr. Burnett mentioned an incident involving a physical injury:

> Q. Okay. And were you able to open the doors to get in and out, or how did it cause you an issue?
> A. If I had something in my hand, my lunch pail, morning coffee, smoothie or whatever, you know, I dropped it before, you know. It was an issue and it was a struggle, but I made it work because I had to make it work.
> Q. If you didn't have anything in your hand, were you able to get in and out of the building without an issue?
> A. It was still a struggle because the doors were heavy and they would close. You know, I would have to stick my arm out to hold them from shutting on my arm or shutting on me. But I could get in the building.
> . . .
> "Q. . . . Do you recall an incident in October 2014 where you twisted your wrist opening the front door?
> A. Yes.
> . . .
> Q. What happened?
> A. I opened the door and tried to push myself back, and my coffee mug slipped. And I tried to grab it and hang onto the door so it wouldn't hit me all at the same time.
> Q. And were you injured in some way?
> A. My wrist hurt. I told Anita on duty, and she's the one that wrote it up.

*Id.* at 45:14-46:4, 148:15-149:14. Mr. Burnett never sought medical attention nor filed a worker's compensation claim and did not suffer a lasting injury to his wrist, and he never sought psychiatric help or therapy. *Id.* at 45:14-46:4, 89:3-10, 148:15-149:14.

In short, while the evidence supporting Mr. Burnett's claim of "genuine injury" resulting in damages is tenuous, the ADA's use of the word "inconvenience" counsels against resolving Mr. Burnett's failure to accommodate claim at summary judgment.

Accordingly, AmeriPort is not entitled to summary judgment on Mr. Burnett's failure to accommodate claim regarding his requests for alterations to the heavy wooden doors at the golf club location.

## C.    Retaliation

The retaliation provision of the ADA provides:

> No person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this chapter.

42 U.S.C. § 12203(a).  To establish a claim of retaliation under the ADA, a plaintiff must show (1) that he engaged in protected conduct, (2) that he suffered an adverse employment action, and (3) that there was a causal connection between the protected conduct and the adverse employment action.  *Carreras v. Sajo, Garcia & Partners*, 596 F.3d 25, 35 (1st Cir. 2010).  If a plaintiff is able to make out a prima facie case, the *McDonnell Douglas* burden-shifting framework applies as described above in subpart B-1.  See *Carreras*, 596 F.3d at 36.  "If the employer produced a legitimate reason for its [adverse employment] decision, the burden shifts back to the plaintiff to show that the motive was discriminatory [or retaliatory]."  *Id.* (internal quotations omitted).  "An ADA plaintiff may assert a claim for retaliation even if she fails to succeed on a disability claim."  *Freadman*, 484 F.3d at 106 (internal citations omitted).

Since there is no mention of retaliation in Mr. Burnett's Charge—in those words specifically or in liberally construed substance—in this forum, he can only raise those incidents occurring after his Charge as retaliatory acts in response to his

Charge. But even considering all the incidents in the record, the Court has already determined that Mr. Burnett did not suffer any adverse employment action. Accordingly, AmeriPort is entitled to summary judgment on Mr. Burnett's ADA retaliation claim.

### D. State Law Claims

The elements and procedures of Mr. Burnett's state law claims for discrimination and retaliation are substantially the same as his federal claims, and courts construe and apply the MHRA "along the same contours as the ADA." *Dudley v. Hannaford Bros., Inc.*, 333 F.3d 299, 312 (1st Cir. 2003). Accordingly, AmeriPort is entitled to summary judgment on Mr. Burnett's state law claims, except for the wooden doors accommodation issue.

## VI. CONCLUSION

The Court DENIES the Defendants' Amended Motion for Summary Judgment (ECF No. 71) as to Counts I and IV regarding the failure to accommodate issue concerning the heavy wooden doors at the golf club location. The Court GRANTS the Amended Motion as to Count II and Count III, and GRANTS the Amended Motion on Counts I and IV on all other issues except the failure to accommodate issue concerning the heavy wooden doors at the golf club location.

SO ORDERED.

/s/ John A. Woodcock, Jr.
JOHN A. WOODCOCK, JR.
UNITED STATES DISTRICT JUDGE

Dated this 11th day of June, 2018